David A. FEHL, Plaintiff,

v.

S. W. C. CORPORATION, a New York Corporation, W. B. McGuire Co., Inc., a New York Corporation, and J. D. Handling Systems, Inc., a New York Corporation, Defendants.

Civ. A. No. 76–335.

United States District Court,
D. Delaware.

June 7, 1977.

---

Arthur Inden and Frederick W. Iobst, Young, Conaway, Stargatt & Taylor, Wilmington, Del., for plaintiff.

John J. Schmittinger, Schmittinger & Rodriguez, Dover, Del., for defendant, W. B. McGuire Co., Inc.

CALEB M. WRIGHT, Senior District Judge.

W. B. McGuire & Co., Inc. ("McGuire"), one of three corporate defendants in this diversity personal injury action, has brought a motion to dismiss for lack of personal jurisdiction on the ground that substituted service of process under 8 Del.C. § 382 was improper and ineffective. The pertinent facts are these. Plaintiff was injured in June, 1975, while operating a Gifford-Wood Model "C" ice-cubing machine. That machine was sold to plaintiff's employer, Diamond Ice and Coal Co. of Wilmington, Delaware, by the Gifford-Wood Company in 1946. McGuire, a New York corporation, was not incorporated until 1959. In 1971, McGuire purchased from Columbia Precision Instruments, Inc., a Maryland corporation, all assets relating to Columbia Precision Corporation's ice product line, including land and buildings, inventory, work in process, sales orders, patents, patent applications, trademarks and trademark applications. Included among those assets was the right to manufacture and sell a Model "370" ice-cubing machine and various ice handling tools, and the right to use the Gifford-Wood name on those products transferred by the agreement, with the reasonable consent of the seller, for a period of five years. Plaintiff alleges that the Model "370" ice-cuber is, in fact, a Gifford-Wood "CB" ice-cuber, which is claimed to be the same or very similar to the Gifford-Wood Model "C" ice-cuber involved in the accident, although McGuire itself has never held out the model as a Gifford-Wood model. In February, 1975, approximately four months prior to the accident, McGuire sold all of its assets relating to the ice product line, including the rights to the "370" model and ice-handling equipment to a third corporation, J. D. Handling, Inc., of New York.[1] From 1972 until February 1975, McGuire supplied Diamond Ice and Coal with certain new replacement parts for use in an ice-cubing machine pursuant to requests from Diamond Ice and Coal.[2] Plaintiff filed a diversity action in this Court against McGuire and three other defendants,[3] alleging strict liability and negligence in the design, manufacture, testing, and inspection of the machine, and in

1. J. D. Handling Systems, Inc. is also a named defendant in this action, but does not join in the present motion.

2. See Affidavit of Victor Levering, paragraph 6 and Exhibits attached thereto.

3. The original defendants in this action were S.W.C. Corp. (a New York corporation); McGuire; J.D. Handling Systems, Inc. (a New York corporation); and S.W. Industries, Inc. (a Massachusetts corporation). The parties have stipulated that S.W. Industries, Inc. be dismissed as a party defendant as of May 11, 1977.

failing to warn the ultimate users of the machine of its allegedly dangerous conditional and operational characteristics.

■ Substituted service was made on McGuire under 8 Del.C. § 382, which provides that:

> Any foreign corporation which shall transact business is this State . . . shall be deemed to have thereby appointed and constituted the Secretary of State of this State, its agent for the acceptance of legal process in any civil action, suit or proceeding against it in any state or federal court in this State arising or growing out of any business transacted by it within this State. . . .

Courts have construed § 382 to require both that the corporation "transact business" in Delaware and that the cause of action "arise or grow out of" specific business transacted in Delaware. *Simpson v. Thiele, Inc.*, 344 F.Supp. 7 (D.Del.1972).

Although McGuire contended in its opening brief that it was not transacting business in Delaware, it has now conceded that it was.[4] The only question left, therefore, is a discrete one: under what circumstances, if any, may personal jurisdiction be assumed under § 382 over a successor corporation based on specific business transacted by its predecessor.[5]

The question appears to be one of first impression.[6] In those Delaware cases construing the "arising out of" requirement, there has been no dispute that the corporation itself transacted some business out of which the cause of action arose. The question faced by the courts has been whether the business out of which the cause of action arose was transacted in Delaware or elsewhere. For example, in *La Chemise LaCoste v. General Mills, Inc.*, 53 F.R.D. 596 (D.Del.1971), the Court determined that, while the defendant apparently sold or solicited orders for the sale of apparel to stores in Delaware (and therefore was transacting business), it had never sold in Delaware toiletries, soaps, or bags using the marks which were the subject of the action. Defendant's motion to dismiss was granted. In *Simpson v. Thiele, supra,* a personal injury action, the Court granted defendant's motion to dismiss for lack of personal jurisdiction on the ground that the machine had been manufactured, sold, and delivered in Pennsylvania, and that plaintiff therefore failed to sustain the burden of proving that the injury sued upon arose or grew out of any business which defendant transacted in Delaware.

**4.** The primary business of McGuire is the manufacture of loading dock equipment, traffic doors and pendador. The conclusion that McQuire was "transacting" business in Delaware is based largely on its relationship with Bruce Industrials Co., an independent distributor of those products in Delaware. Bruce did not handle any of the ice product line for McGuire.

**5.** Although neither party has made any showing as to the circumstances of the original transaction (such as where the machine was manufactured, sold and/or delivered), it will be assumed for the purposes of this motion that the sale and/or delivery took place in Delaware. That sale or delivery would be sufficient to satisfy the arising out of requirement if Gifford-Wood were the present party defendant. *See, Perry v. American Motors Corporation,* 353 A.2d 589 (Del.Super.1976).

**6.** The only cases which the court found involving a similar fact pattern did not touch this particular issue. In *Rosen v. Savant Instruments, Inc.*, 264 F.Supp. 232 (E.D.N.Y.1967), on a motion to transfer, the court found the defendant corporation subject to jurisdiction in Rhode Island for a wrongful death action growing out of a sale of high voltage equipment, either by the defendant corporation or by its predecessor in interest. The court apparently attributed certain business transacted by the President of the predecessor corporation to the successor for the purpose of satisfying Rhode Island's broad long-arm statute, which provided for service over non-resident corporations possessing the "necessary minimum contacts". The court did not discuss the relationship between the predecessor in interest corporation and the defendant.

In *Damon Alarm Corporation v. American District Telegraph Co.*, 304 F.Supp. 83 (S.D.N.Y.1969), the court granted a motion to dismiss the complaint on the ground that the defendant Delaware corporation had gone out of existence as a result of a statutory merger with a New York corporation and, therefore no action could be maintained against it. There was no discussion of whether an action could have been maintained against the surviving corporation.

In this case, it is assumed that the 1946 sale and/or delivery of the machine took place in Delaware. See n. 4, *supra*. It is not disputed that McGuire was not in corporate existence in 1946 and that McGuire neither manufactured nor sold the machine involved in the injury. The question remaining, therefore, is whether the "arising out of" requirement is satisfied by the acquisition by McGuire of certain assets which were once held by the corporation that manufactured and sold the machine. The question is really one of fairness and equity. Under what circumstances, if any, would it be consonant with notions of fairness and justice to ascribe business transacted by a predecessor corporation to its successor corporation?

Two alternative theories can be advanced in support of personal jurisdiction over McGuire. For convenience, these theories will be labeled the "corporate" and the "tort" theory.[7] The basis of the "corporate theory" is that, by acquiring substantially all the assets of the ice product line which originally belonged to the Gifford-Wood Company and taking over the ice product manufacturing operation, McGuire in effect became the present-day embodiment of the Gifford-Wood Company and therefore is amenable to service of process under § 382. The "tort theory" would impose jurisdiction over McGuire based on its own acts. Under certain circumstances,[8] the successor corporation may have a duty to warn of defects existing in products sold by the predecessor corporation. If a nexus exists between business conducted by the successor corporation within the state and a failure to fulfill that duty, the "arising out of" requirement may be satisfied.

Sitting in diversity, this Court is bound by the construction placed on § 382 by the Delaware courts. *Pioneer National Title Insurance Co. v. Sabo*, 432 F.Supp. 76 (D.Del.1977). Since this particular issue has never been presented in this jurisdiction,

the Court must determine how the Delaware courts would interpret the reach of § 382.

The "arising out of" requirement of § 382 is a legislatively imposed limitation on the constitutionally permissible breadth of long-arm jurisdiction. The due process clause does not require that the cause of action arise out of particular business transacted within the state. If the corporation has carried on continuous and systematic activities in the state, it is consonant with notions of due process to require the corporation to defend a suit based on an act committed outside the state, unrelated to business activities within the state. *See, Ratliff v. Cooper Labs., Inc.*, 444 F.2d 745 (4th Cir. 1971); *Erving v. Virginia Squires Basketball Club*, 349 F.Supp. 709 (E.D.N.Y. 1972); *Taisho Fire and Marine v. Vessel Montana*, 335 F.Supp. 1238 (N.D.Cal.1971). The Delaware legislature has chosen not to expand the long-arm jurisdiction of the courts to that extent, but rather to restrict the reach of the long-arm statute to causes of action "arising or growing out of any business transacted by it within this State." Consequently, the "arising out of" requirement should be construed narrowly in order to implement the intention of the legislature. *See, Eastman Kodak Co. v. Studiengesellschaft Kohle*, 392 F.Supp. 1152 (D.Del.1975). In contrast, the "transacting business" prong of the test has been construed liberally by the Delaware courts. *See, e. g., Gentry v. Wilmington Trust Co., 321 F.Supp. 1379 (D.Del.1970); Crowell Corporation v. Topkis Construction Co., 267 A.2d 613 (Del.Super.1970); Nacci v. Volkswagen of America, Inc., 297 A.2d 638 (Del. Super.1972).*

## I. *CORPORATE THEORY*

This is not a motion for summary judgment. The Court therefore makes no determination as to the merits of plaintiff's

---

7. These terms were borrowed from the discussion of the substantive law in Note, "Assumption of Products Liability in Corporate Acquisitions", 55 Boston Law Review 86.

8. Those circumstances out outlined *infra* at 948–950.

cause of action against this defendant.[9] Certain principles of the substantive law with respect to the assumption by successor corporations of products liability are relevant to this jurisdictional question, however. Common to the scope of both jurisdiction and liability is the fairness of making a corporation which enjoys the benefit of business within the state answerable in that jurisdiction for wrongdoing associated with that business. *See, Shannon v. Samuel Langston Co.,* 379 F.Supp. 797 (W.D. Mich.1974), and Note, "Assumption of Products Liability in Corporate Acquisitions," *supra,* at no. 5 (discussions of the policy behind imposing substantive liability on certain successor corporations). That consideration has been enunciated by the Delaware courts. In *Sinwellan Corp. v. Farmers Bank of Delaware,* 345 A.2d 430, 432 (Del. Super.1975), the court stated that:

> This broad definition [of "doing business" in § 382] has been adopted as a protective measure to ensure that wrongdoing corporations cannot escape liability when their ties with the residents of a state are sufficient to cause an injury by claiming that those ties are not sufficient to allow the resident to sue the corporation within that state.

In view of the similarity between the concerns with respect to jurisdiction and to liability, certain analogies have been drawn from the developing body of substantive law in the area of products liability in analyzing the applicability of the corporate theory to the issue presented by this motion.

 In general, corporate liabilities adhere to the corporate entity and not to the nature of the manufacturing enterprise. In *McKee v. Harris-Seybold Co.,* 109 N.J.Super. 555, 264 A.2d 98 (L.Div.1970), *aff'd,* per curiam, 118 N.J.Super. 480, 288 A.2d 585 (1972), the court refused to find that the liabilities had been transferred together with corporate assets, noting that:

> The identity of the corporation and of its stockholders as an integral part of the

corporate identity was not eradicated by the transfer. The corporation could no longer function as a manufacturer, yet it could and did operate and function as a corporation for some time after the sale. The vendor corporation, as a corporate entity, was not absorbed into the purchasing corporation.

> What was absorbed was the nature of the manufacturing operations previously engaged in by Seybold, not the corporate entity itself.

264 A.2d at 104.

It is a general rule that where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor, including those arising out of the former's tortious conduct. *Shane v. Hobam, Inc.,* 332 F.Supp. 526 (E.D.Pa.1971); *Kloberdanz v. Joy Manufacturing Co.,* 288 F.Supp. 817, 820 (D.Col.1968); 15 Fletcher, Cyclopedia of Corporations (Perm.Ed.) §§ 7122, 7123; 19 Am.Jur.2d Corporations, § 1546, at 922.

Despite the general rule, in some limited situations where an avoidance of liability would be unjust, a purported sale of assets for cash or other consideration may be found to transfer liabilities of the predecessor corporation. A buyer may be found to have assumed the selling corporation's liabilities, for example, if there has been a de facto merger or consolidation or if the successor corporation is a mere continuation of the predecessor under a different corporate name. *Knapp v. North American Rockwell Corp.,* 506 F.2d 361 (3rd Cir. 1974); *Shannon v. Samuel Langston Co.,* 379 F.Supp. 797 (W.D.Mich.1974). If the seller corporation is absorbed into the buyer, and if the seller's stockholders continue to have an ownership interest in the buyer, a merger may be found even though statutory requirements were not followed. Similarly, if a new corporation is formed to acquire the assets of an existing corporation, which then ceases to exist, the successor may be

---

9. The question of whether plaintiff's cause of action under strict liability or failure to warn exists in Delaware is still unsettled. *See, e. g., Truitt v. General Tire & Rubber Co., et al.,* Civil

Action No. 4716 (D.Del., October 19, 1976); *Windle v. Clark Equipment Co.,* 373 A.2d 571, No. 110, 1976 (Supreme Ct.Del., April 11, 1977).

found to be a mere continuation of the predecessor. "[T]here is in effect but one corporation which merely changed its form and ordinarily ceases to exist upon the creation of the new corporation which is its successor." Fletcher, *supra*, § 7205.

A number of courts which have recently considered products liability claims have refused to find a de facto merger or continuation of business enterprise based on the facts before them. *See, e. g., Kloberdanz v. Joy Manufacturing Co., supra; McKee v. Harris-Seybold Co., supra; Bazan v. Kux Mach. Co.,* 358 F.Supp. 1250 (E.D. Wis.1973). In each of those cases, the corporation which manufactured the defective product was no longer in corporate existence at the time of the injury. In refusing to find a de facto merger or continuation, the courts relied primarily on the fact that the sale of the assets was for cash rather than stock, that the seller corporation continued to exist for a period of time after the sale, and that the seller corporation continued to possess substantial assets with which to satisfy demands of creditors.[10] Under those circumstances, the liabilities of the predecessor corporation were not transferred to the successor together with the assets.

Several other products liability cases have upheld the plaintiff's right to recover against a successor corporation based either on a de facto merger or continuation theory. In *Cyr v. B. Offen and Co.,* 501 F.2d 1145 (1st Cir. 1974), the court found the defendant corporation to be a mere continuation of its predecessor proprietorship. The court acknowledged that the sale of assets had been an arms-length, bona fide transaction, but relied on the fact that the corporation continued the business operations substantially as before, maintaining the same management and personnel and advertising itself as the same business.[11] In *Knapp v. North American Rockwell Corp.,* 506 F.2d 361 (3rd Cir. 1974), the court, applying Pennsylvania law, held the transfer of assets to be a merger. In doing so, the court relied on the insubstantiality of the continued existence of the seller corporation, the contractual requirement that the seller be dissolved as soon as possible, the prohibition on engaging in normal business transactions, and the character of assets the seller controlled.[12] *See also, Shannon v. Samuel Langston Co.,* 379 F.Supp. 797 (W.D.Mich. 1974) (de facto merger.)

Although the Court could not find any Delaware cases involving the assumption of products liability by successor corporations, the general principle outlined above have been applied by Delaware courts to ordinary creditor claims. The continuation theory, which has rarely been raised, has been construed narrowly by the Delaware courts. In the only case which discussed that theory directly, it was held that the theory applied only to a reorganization or change of corporate name:

> . . . [I]n order to recover from a corporation of one name the obligations of a corporation of another name, upon the theory that the former is a mere continuation of the latter, it must appear that the former is the same legal entity as that whose obligations is sought to be charged upon it as one of its own; that is

---

10. The fact that the predecessor corporation may continue to possess substantial assets may afford protection to ordinary contract creditors, whose claims are ascertainable at the time of the transfer. It does not necessarily protect products liability plaintiffs, since their claims are contingent and may not arise until long after the corporation is dissolved and its remaining assets distributed. Consequently, in the context of products liability cases, the latter factor would not seem to be as relevant as the first two. *See,* Note, "Assumption of Products Liability in Corporate Acquisitions", *supra.*

11. In *Cyr,* the employees of the proprietorship joined together to buy a 70% interest in the business following the death of the proprietor. For the most part, the management and personnel of the company remained the same. The remaining 30% interest was sold to an outside party who did not interfere in the running of the company.

12. In addition, the Court found significant the concern of the Pennsylvania Supreme Court, expressed in other products liability cases, with policy considerations such as the ability of the parties to spread the loss. *Knapp v. North American Rockwell Corp.,* 506 F.2d at 369–370.

to say, it must be the same legal person having a continued existence under a new name.

*Ozan Lumber Co. v. Davis Sewing Machine Co.,* 284 F. 161 (D.Del.1922).

*See generally,* Folk, The Delaware General Corporation Law, 421–423. In general, no liability has been found under a de facto merger theory so long as the transfer was in the ordinary course of business and the seller received and held consideration. *McKee v. Standard Minerals Corp.,* 18 Del.Ch. 97, 156 A. 193 (1931). Only in a few cases, where the consideration passed directly to the transferor's stockholders without coming into possession of the transferor corporation, has a de facto merger been found. *McKee v. Standard Minerals Corp., supra; Drug v. Hunt,* 5 W.W.Harr. 339, 168 A. 87 (1933); *Bryant, Griffith & Brunson v. General Newspaper,* 6 W.W.Harr. 468, 476, 178 A. 645 (1935). *See generally,* Folk, The Delaware General Corporation Law, 421–423.

 The rationale of the substantive liability cases, in Delaware and elsewhere, is equally applicable to the problem of personal jurisdiction. If the original Gifford-Wood Company existed today in the same form as it did in 1946 (and was "transacting business" in Delaware), it would be subject to the jurisdiction of this Court on the basis of its sale and delivery of the ice-cubing machine to Diamond Ice and Coal. If McGuire absorbed the Gifford-Wood Company entity through merger or reorganization, therefore, it would not offend notions of fairness to require McGuire to submit to the jurisdiction of the Delaware courts.

 In Delaware cases involving assumption of personal jurisdiction over parent or alter ego corporations, the courts have approved the principle that a separate corporate entity may be disregarded where it would otherwise shield a parent or alter ego corporation from liability for acts attributable to it. In *La Chemise LaCoste v. General Mills, Inc.,* 53 F.R.D. 596, 603 (D.Del.1971), on a motion to dismiss additional defendants, the Court stated that:

> The law is well settled in this Circuit. Corporate entities must be respected in the absence of clear proof that one corporation is the mere agency or department of the other "and is used as an instrumentality to perpetuate fraud, justify wrong, avoid litigation or render it more difficult, or generally to escape liability for what are in substance its own acts." (citations omitted).

Recently the Delaware Superior Court indicated approval of the "strong policy argument" that a foreign corporation "should not be permitted to market its products and retain immunity from suit in local courts 'simply by structuring its business operations in such a way as to avoid direct activity.'" (citations omitted). *Perry v. American Motors Corp.,* 353 A.2d 589, 592 (Del. Sup.1976).[13] The implication of those cases is that personal jurisdiction under § 382 may be assumed over a successor corporation, on the basis of acts of its predecessor, in cases where a merger or continuation has preserved the same corporate entity intact.

 Once jurisdiction has been challenged, the burden rests on plaintiff to establish facts supporting jurisdiction. *Simpson v. Thiele, supra.* If plaintiff can show that McGuire is the same corporate entity as the original Gifford-Wood Company, service of process under § 382 would be proper.

Plaintiff has failed to meet that burden. There are at least two relevant corporate transactions involving a transfer of the assets relating to the ice product line between 1946 and the time of the accident: from Gifford-Wood to Columbia Precision, and from Columbia Precision to McGuire.[14] Plaintiff has presented no evidence as to

---

**13.** The Court found it unnecessary to posit jurisdiction on that sole consideration, however, since it found that the parent corporation had sufficient contacts with Delaware to be amenable to service of process there.

**14.** In light of the Court's holding with respect to the effect of those transfers, it need not discuss the effect of the transfer of the ice products line from McGuire to J. D. Handling on preexisting liabilities of any of the predecessor corporations.

the circumstances under which Columbia acquired the ice product line. Plaintiff has not satisfied its burden of establishing that the transaction amounted to a de facto merger or continuation, rather than a straight sale of assets for good consideration. Columbia Precision, therefore, cannot be held to have assumed the actual or contingent liabilities of Gifford-Wood, and thus McGuire could have assumed no liabilities.

The same result obtains even if the Court assumes that the Gifford-Wood-Columbia Precision transfer was a merger or continuation of the corporate existence, and focuses on the second transfer of the ice product line assets from Columbia Precision to McGuire. As is evidence by the agreement between the parties of May 31, 1972, the transaction was an arms-length, bona fide, cash sale.[15] The plaintiff has produced no evidence that the seller of the assets maintained any ownership or management interest in McGuire. McGuire has represented that, to the best of its knowledge, none of its past or present employees, officers, or directors were employees, officers, or directors of Gifford-Woods. See Answer of McGuire to Plaintiff's Second Set of Interrogatories, # 115. There is no evidence in the record on the present motion as to whether Columbia Precision continued in corporate existence following the sale of the ice product line to McGuire. The only evidence in support of plaintiff's contention is that McGuire took over the physical plant and operations of Columbia at Hudson, New York, and that McGuire apparently did not expressly notify independent distributors such as its distributor in Pennsylvania, IPECO, to change the advertisements contained in the distributor's catalogue to reflect the change in ownership. See Deposition of Albert L. Ribeiro, Jr. (March 28, 1977), at 31, 38. The Court does not find that evidence persuasive. Since McGuire purchased Columbia's physical plant as part of the transaction, it was natural that it should take over the same premises. An amalgamation of assets, without more, does not constitute a merger. *Bryant, Griffith & Brunson v. General Newspapers, supra.* The IPECO catalogues were prepared and distributed independently by IPECO for the purpose of soliciting sales on behalf of IPECO. McGuire did notify IPECO, along with its other customers, that future inquiries or orders were to be sent in the name of McGuire. See Deposition of Albert L. Ribeiro, Jr., *supra,* at 12. That change is reflected in the orders for replacement parts send by Diamond Ice and Coal to McGuire between 1972 and 1975. See Exhibits attached to Affidavit of Victor Levering.

In conclusion, plaintiff has not met its burden of establishing that McGuire is the present-day embodiment of the Gifford-Wood corporate entity. Consequently, for the purpose of assuming personal jurisdiction, the Court will not attribute to McGuire business transacted in Delaware by the Gifford-Wood Company. Service of process under § 382 was therefore improper, unless it can be sustained under the alternative tort theory.

## II. *TORT THEORY*

 Under the tort theory, personal jurisdiction would be assumed not on the basis of the acts of the predecessor corporation, but on the basis of independent acts of the successor corporation. The tort theory is implicit in *Shane v. Hobam, Inc.,* 332 F.Supp. 526 (E.D.Pa.1971), in which Judge Higginbotham indicated that a successor corporation may acquire a duty to warn its predecessor's customers of dangers discovered after the purchase of the product. The defendant in *Shane* purchased the man-

---

**15.** The terms of the agreement provided for payment by McGuire of $260,000 cash and execution of a promissory note in the principal amount of $75,000 and a second promissory note in the amount of $50,000. McGuire agreed to assume all of the seller's obligations under certain listed sales and purchase orders. McGuire received the right to use the name "Gifford-Wood" with respect to products manufactured or sold by the seller for a period of five years, subject to the reasonable consent of the seller, but did not receive the right to use decals, logos and other trademarks of the seller. The seller agreed not to compete with the line of products sold pursuant to the agreement.

ufacturer's assets, good will and name in 1962. The seller agreed to indemnify the buyer against products liability based on machines sold prior to 1962, while the defendant agreed to service and adjust the previously sold machinery. The business was continued substantially intact as a division of defendant's corporation.

Defendant moved for summary judgment, claiming that the defendant was not liable to its predecessor's customers solely by reason of its purchase of assets and continued operation of the business under its original name. The Court agreed with defendant's contention, but found that certain facts in the record indicated that defendant might be independently liable for a failure to warn past customers of defects in the machinery. The Court found crucial the evidence of the successor's acquisition of its predecessor's name and good will, its continued representation of the acquired company as the same enterprise, and its assumption of a continuing service responsibility. The Court refused to grant summary judgment on the ground that the record was unclear as to whether the machine in question had been serviced by defendant and whether defendant had acquired knowledge which indicated that the machine was defective. The rationale behind Judge Higginbotham's discussion of the duty to warn seems to be that the successor corporation was benefiting from the past acts of the manufacturer, including its good will, name, and relationship with past customers. Further, the Court noted that defendant had the continuing responsibility to test and improve the product in question, thereby implying that the successor corporation may be held liable because its control over the product gives it the power to prevent harm from a preexisting defect by warning the user.

The question whether the *Shane v. Hobam* theory would be applied by the Delaware courts is more appropriately left to a summary judgment motion. Given the present posture of the case, the Court can only assume that plaintiff's theory that McGuire is independently liable for a fail-

ure to warn of preexisting defects is not unfounded in the law. Even assuming that such a cause of action exists in Delaware, however, plaintiff must still demonstrate that the cause of action arose out of particular business transacted by McGuire in Delaware.

For jurisdictional purposes, plaintiff must establish some nexus with Delaware other than the mere fact of the injury in Delaware. The gravamen of the claim is an omission—a failure to warn of known dangers. Consequently, it is difficult to tie down the claim of a particular business transaction in a given jurisdiction. According to the Court in *Shane v. Hobam,* the duty to warn does not arise unless the successor corporation undertakes certain positive responsibilities such as servicing of machines previously sold, profits from the use of the good will and reputation of the predecessor corporation, and has actual or constructive knowledge of the existing defect. Consequently, if plaintiff could establish that McGuire transacted business in Delaware related to the servicing of the Gifford-Wood ice-cuber involved in the accident, traded on the name and reputation of the Gifford-Wood ice-cubers in Delaware, or gained knowledge of specific defects in the machine through business transacted in Delaware, then the "arising out of" requirement of § 382 could be satisfied.

On the record before this Court, plaintiff has failed to meet that burden. Plaintiff relies on the shipment by McGuire of certain replacement parts for the Gifford-Wood machine to Diamond Ice and Coal, and on the soliciting activities of IPECO, a Pennsylvania corporation, in Delaware. Neither fact establishes a sufficiently specific nexus with McGuire's alleged duty to warn. Although Diamond Ice and Coal did send the orders for replacement parts directly to McGuire, those orders were not solicited by McGuire. The parts were shipped F.O.B. New York by McGuire. See Exhibits attached to Affidavit of Victor Levering. McGuire never agreed to or actually serviced or advised as to the operation of the machine owned by Diamond Ice

**950**

and Coal. See Answer of McGuire to Plaintiff's Second Set of Interrogatories, # 104. While IPECO did continue to advertise an ice-cubing machine as a G–W "C" or "CB" machine, it apparently did so independently, not pursuant to any agreement or request by McGuire. See Deposition of Albert L. Ribeiro, Jr., *supra,* at 31, 38. The record is unclear as to whether McGuire had any actual knowledge that the ice-cubing machines were being advertised as "G–W" machines. See Deposition of Albert L. Ribeiro, *supra,* at 31, 38.[16] Further, IPECO never sold an ice-cubing machine on behalf of McGuire in Delaware. See Deposition of Albert L. Ribeiro, Jr., *supra,* at 42. Consequently, McGuire did not trade on or benefit from the Gifford-Wood name and reputation with respect to the "C" or "CB" ice-cuber by specific business transacted in Delaware. There is no evidence in the record that McGuire gained knowledge of any defect in the Gifford-Wood machine through business transacted in Delaware. Taken as a whole, the evidence presented establishes no specific business transacted by McGuire in Delaware related to the injury incurred by plaintiff. Consequently, jurisdiction under § 382 cannot be sustained on the basis of McGuire's alleged failure to warn of defects in the Diamond Ice and Coal machine.

Defendant McGuire's motion to dismiss for lack of personal jurisdiction is granted.

16. Although the purchase agreement provided that McGuire could use the Gifford-Wood name for a period of five years, there is no evidence in the record that McGuire in fact used the name during the time it possessed the ice product line.