Nina ELMER, Individually, and in her capacity as Widow of George W. Elmer, Deceased, and as personal representative of his estate, Plaintiff,

v.

TENNECO RESINS, INC., a Delaware corporation, Tenneco Polymers, Inc., a Delaware corporation, Tenneco Corporation, a Delaware corporation, and Tenneco Inc., a Delaware corporation, Defendants.

Civ. A. No. 86–295–CMW.

United States District Court,
D. Delaware.

Nov. 1, 1988.

Ben T. Castle, and Alison Whitmer Tumas, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for plaintiff.

James T. McKinstry, and Emily B. Horton, of Richards, Layton & Finger, Wilmington, Del. (George S. Flint, and Joseph T.C. Hart, of Fulton, Duncombe & Rowe, New York City, of counsel), for defendants.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

The plaintiff, Nina Elmer, individually and as a personal representative of the Estate of George W. Elmer, brought this product liability action on June 30, 1986, against defendants Tenneco Resins, Inc. ("TRI"), Tenneco Polymers, Inc., Tenneco Corporation and Tenneco Inc. (formerly Tennessee Gas Transmission Company and hereinafter "TGT"). She alleges that the defendants are jointly and severally liable for her husband's 1984 death, which, the parties agree, was caused by deposits of an X-ray contrast material called Thorotrast in the decedent's liver.

The plaintiff alleges that the Thorotrast was administered to Mr. Elmer in 1952 at the Veterans Administration Hospital in Washington, D.C., and was manufactured and sold by Heyden Chemical Corporation ("Heyden"). She further alleges that the defendants are liable as successors to Heyden's liability. The defendants dispute the source of the drug and deny any successor liability. Defendants moved for summary judgment, alleging, *inter alia*, that they are not liable for the alleged torts of Heyden and that the plaintiff's claims must be dismissed because she cannot produce contemporaneous evidence of the injection sufficient to establish a prima facie case of negligence, strict liability, *res ipsa loquitur* or breach of warranty. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

For the reasons stated herein, the defendants' motion is granted in part and denied in part.

## I. FACTS

On October 30, 1984, plaintiff's husband, George W. Elmer, died of liver failure. An autopsy revealed that the cause of Mr. Elmer's death was angiosarcoma (cancer) of the liver, induced by an injection of Thorotrast many years earlier.

For a number of years prior to December 1, 1953, Heyden, a Delaware corporation, owned the U.S. patent and trademark for and was the sole manufacturer of Thorotrast in the United States. By an agreement made on November 3, 1953, Heyden sold its Antibiotic Division, including its Thorotrast assets, inventory, patent and trademark, to American Cyanamid Company ("Cyanamid"). Pursuant to the terms of the sales agreement, Heyden agreed to indemnify Cyanamid against claims arising from the operation of the antibiotic division prior to December 1953. Cyanamid owned the Thorotrast business until May 1954, when it sold the equipment, inventories and all other rights of the Thorotrast business to Testagar & Co., Inc.

After the sale of its Antibiotic Division, Heyden remained in business for nearly ten years. In 1957, Heyden changed its name from Heyden Chemical Corporation to Heyden Newport Chemical Corporation ("Heyden Newport"). It remained a Delaware corporation.

On June 28, 1963, Heyden Newport entered into a "Plan of Reorganization" with Tennessee Gas Transmission Company ("TGT"), also a Delaware corporation, and HDN Corporation ("HDN"), also a Delaware corporation and a wholly owned subsidiary of TGT. The 1963 Plan called for Heyden Newport to transfer all of its assets, properties, business, goodwill and liability to HDN in exchange for common stock of TGT. Article 5.3 of the Plan provided that HDN would assume those liabilities of Heyden Newport—whether absolute, contingent or otherwise, and whether or not reflected on Heyden Newport's balance sheet—that existed at the closing date of October 4, 1963.[1] The actual extent and effect of this assumption of liabilities is one of the principal disputes in this case, as detailed below. The Plan also provided that HDN would continue the business of Heyden Newport and that HDN would continue to employ the employees of Heyden Newport.

After the closing, which completed a Sale of Assets under Section 271 of the Delaware General Corporation Law, 8 *Del.C.* § 271 (1983), Heyden Newport filed a Certificate of Dissolution under the name Denport Corporation. All of the officers of Heyden Newport assumed the same offices with HDN.

TGT organized and incorporated HDN for the express purpose of accepting a transfer of Heyden Newport assets. HDN had no independent office, and it shared a post office box with its parent, TGT. The wholly owned subsidiary was capitalized solely by funds from TGT, for which it paid no consideration. HDN never had any employees, and its original officers and directors were all employees of TGT and were paid no salary by HDN.

A series of name changes followed. Within a year of the 1963 closing, HDN changed its name to Heyden Newport Chemical Corporation, and in 1965 Heyden Newport changed its name to Tenneco Chemicals, Inc. In 1966, TGT changed its name to Tenneco Inc. In 1983, Tenneco Chemicals, Inc. changed its name to Tenneco Resins, Inc. ("TRI"). Subsequent to the filing of the complaint in this case, Tenneco Inc. changed its name to Tennessee Gas Pipeline Company ("TGP").

As noted, the plaintiff originally sued four entities. However, the plaintiff has dropped her claims against Tenneco Polymers, Inc. and Tenneco Corporation. Therefore, summary judgment as to those two companies is granted. There remain, then, two defendants—Tenneco Resins, Inc., ("TRI") and Tenneco Inc. (now "TGP"). The plaintiff asserts liability against TRI on the ground that TRI succeeded to the liabilities of Heyden Newport. She asserts liability against Tenneco Inc. on the ground that Tenneco Inc. dominated or acted as the agent of TRI. TRI has never itself manufactured, promoted or sold Thorotrast.

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), a moving party is entitled to summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Wilmington Housing Auth. v. Pan Builders, Inc.*, 665 F.Supp. 351, 353 (D.Del.1987). The Court must view all the facts, and any reasonable inference from those facts, in the light most favorable to the party opposing summary judgment. *Id.*

---

1. Article 5.3 of the 1963 Plan states:
5.3 Subject to the conditions herein set forth, from and after the Closing Date HDN shall assume and agrees to pay, perform and discharge all debts, obligations, contracts and liabilities of Heyden of any kind, character or description, whether accrued, absolute, contingent or otherwise (and whether or not reflected or reserved against on Heyden's Balance Sheet, books of accounts and records), all as the same shall exist at the Closing Date....

For a party to prevail on summary judgment in a contract action, the Court must be convinced that the contractual terms present only a question of law. *Alexandria Coca–Cola Bottling Co. v. Coca–Cola Co.*, 637 F.Supp. 1220, 1225 (D.Del.1984) (holding that ambiguity in meaning of contractual phrase precluded summary judgment). That is, the Court must determine whether the language "is so clear that it can be read only one way." *Id.* at 1226 (quoting *Landtect Corp. v. State Mutual Assurance Co. of America*, 605 F.2d 75, 80 (3d Cir.1979)). If the non-moving party presents a reasonable reading of the contract that varies from the interpretation offered by the movant, then a question of fact exists which can only be resolved through trial. 637 F.Supp. at 1226.

However, not every factual ambiguity necessitates a trial. By its very terms, the standard of Rule 56(c) provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–28, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

## III. DISCUSSION

### A. *Withdrawn Claims*

As noted, plaintiff has withdrawn her claims against Tenneco Polymers, Inc. and Tenneco Corporation. Consequently, summary judgment as to those entities is granted. Plaintiff has also withdrawn her claims for breach of express warranties, and summary judgment is granted as to those claims.

Finally, plaintiff concedes that, without a contemporaneous medical record of Mr. Elmer's Thorotrast injection, she cannot prove that the Thorotrast administered to Mr. Elmer was at all times under the control of Heyden Chemical Corporation. Therefore, she is not pursuing her cause of action based on *res ipsa loquitur*, and summary judgment is granted on that claim.

### B. *Breach of Implied Warranty*

Mr. Elmer allegedly received his Thorotrast injection in 1952. He died on October 30, 1984, and his wife filed suit on June 30, 1986. The defendants argue that Delaware's borrowing statute mandates application of Delaware's statute of limitations and that, under Delaware law, plaintiff's claims for breach of implied warranty are time barred. The plaintiff contends that the District of Columbia's substantive law and statute of limitations should apply to this case and that, under this law, her claims for breach of implied warranty are timely.

The defendants are correct, and plaintiff's claims for breach of implied warranty are time barred. This Court, sitting in diversity, must apply Delaware conflict of law rules. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). A court must apply Delaware's borrowing statute, 10 *Del.C.* § 8121, when a non-Delaware resident brings a cause of action in a Delaware court and the cause of action arose outside of Delaware. *McIntosh v. Arabian American Oil Co.*, 633 F.Supp. 942, 945 (D.Del. 1986). The plaintiff here is a citizen of Maryland and the defendant corporations are incorporated in Delaware. Assuming *arguendo* that Mr. Elmer did receive a Thorotrast injection in Washington, D.C., that is arguably where plaintiff's cause of action arose.

Delaware's borrowing statute, enacted in 1947, provides that:

Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of *whichever is shorter*, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action....

10 *Del.C.* § 8121 (1975) (emphasis added).

Delaware courts treat a breach of warranty claim as a contract rather than a tort

claim for conflict of laws purposes. *Sellon v. General Motors Corp.*, 571 F.Supp. 1094, 1097 (D.Del.1983). Under Delaware law as it existed in 1952, a litigant must bring a cause of action for breach of warranty within three years after the time the cause of action accrued. 10 *Del.C.* § 8106 (1975).[2] A cause of action for breach of implied warranty accrues on the date of the sale of the allegedly faulty product, not from the time a defect is discovered. *Harvey v. Sears, Roebuck & Co.*, 315 A.2d 599, 601 (Del.Super.1973); *Gaffney v. Unit Crane and Shovel Corp.*, 117 A.2d 237, 239 (Del.Super.1955). While Delaware courts have recognized a "discovery rule" in other contexts, *see Layton v. Allen*, 246 A.2d 794, 798 (Del.1968) (limitations period in medical malpractice action did not begin to run until plaintiff became aware of injury), the courts have not extended the rule to claims of breach of implied warranty. *See Sellon*, 571 F.Supp. at 1099 (under 6 *Del.C.* § 2–725(2), reasonable discovery of defect is only relevant where warranty explicitly extends to future performance).

Applying these principles of Delaware law, plaintiff's right to bring a cause of action for breach of warranty expired three years after the alleged injection of Thorotrast in 1952 and is thus time barred. Because Delaware's borrowing statute requires the Court to apply the *shorter* of the Delaware statute of limitations or the statute of limitations of the state where the cause of action arose, and plaintiff's claim is time barred under Delaware law, further analysis of where the action arose and what statute of limitations would apply there is unnecessary.

Despite the seemingly clear law in this regard, plaintiff argues that the Court should *not* apply Delaware law to plaintiff's claims because a Delaware federal

court should apply a foreign state's statute of limitations whenever it would apply a foreign state's substantive law to the merits of the case. In support of this proposition plaintiff cites this Court's opinion in *Dymond v. National Broadcasting Co., Inc.*, 559 F.Supp. 734, 737 (D.Del.1983).

Plaintiff's reliance on *Dymond* is misplaced. *Dymond* was a multistate defamation action, an area in which choice of law questions have been called "special" and "unusual." *See Keeton v. Hustler Magazine, Inc.*, 828 F.2d 64, 66 (1st Cir. 1987). The specific question in *Dymond* was whether the Court should apply the Delaware two-year statute of limitations or the Louisiana one-year statute of limitations when the plaintiff lives and works in Louisiana. 559 F.Supp. at 735. The Court determined that the substantive law of Louisiana applied because of the plaintiff's numerous contacts with that state. *Id.* at 738. It also concluded that, in order to effectuate the Delaware borrowing statute's policy of preventing forum shopping, Louisiana's shorter statute of limitations applied. *Id.* at 736–37.

The disagreement among the parties here as to the Court's holding in *Dymond* stems from the Court's statement that "the Delaware courts will apply the foreign state's statute of limitations whenever it [sic] would apply the foreign state's substantive law." *Id.* at 736. As subsequent Delaware decisions indicate, this statement cannot be read literally for the proposition that a Delaware court will in every instance apply a foreign state's statute of limitations when it is applying a foreign state's substantive law.

For instance, in *Amoroso v. Joy Mfg. Co.*, 531 A.2d 619 (Del.Super.1987), the Delaware Superior Court faced the question

---

**2.** That statute reads, in pertinent part:
  ... no action based on a promise ... shall be brought after the expiration of 3 years from the accruing of the cause of such action; subject, however, to the provisions of §§ 8108–8110, 8119 and 8127 of this title. (Code 1852, § 2742; Code 1915, § 4671; Code 1935, § 5129; 46 Del.Laws, c. 115, § 1; 10 Del.C. 1953, § 8106; 57 Del.Laws, c. 568, § 2).
  10 *Del.C.* § 8106 (1975).

In Delaware, the Uniform Commercial Code (U.C.C.) does not apply to transactions entered into before June 30, 1967. *Harvey v. Sears, Roebuck & Co.*, 315 A.2d 599, 601 (Del.Super. 1973). The fact that the alleged injury occurred after the enactment of the U.C.C. is irrelevant under Delaware law when the alleged sale or delivery occurred before 1967. *Comer v. Getty Oil Co.*, 438 A.2d 1239, 1241 (Del.Super.1981).

of whether to apply Maryland's or Pennsylvania's statute of limitations to the plaintiff's breach of warranty claims. *Id.* at 620. In construing Delaware's borrowing statute, the Court found that the plaintiff's claims were time barred and that it need not consider the time limited by the state where the cause of action arose. *Id.* at 621.

Similarly, in *McIntosh v. American Arabian Oil Co.*, 633 F.Supp. 942 (D.Del.1986), the Court was asked to determine what statute of limitations applied to an employment contract that could have been interpreted under New York or Saudi Arabian law. *Id.* at 945-46. Applying Section 8121, the Court held that Delaware's time limitation, whether the longer or shorter of the New York and Delaware time periods to be compared pursuant to Delaware's borrowing statute, effectively barred any claim by the plaintiff for either breach of contract or for benefits due. *Id.* at 946. The Court also noted that the "same reasoning would apply to bar any claim if the Saudi Arabian statute of limitations had been found to be applicable." *Id.* at 946 n. 1.

In the present action, plaintiff's claims for breach of implied warranty are clearly time barred under Delaware law. Pursuant to Section 8121 and the cases applying it, an extensive analysis of where plaintiff's cause of action arose and what the statute of limitations is there are unnecessary. The *Dymond* decision should not be read so broadly as to mandate application of a foreign state's statute of limitations every time a foreign state's substantive law is applied. Because plaintiff's claims for breach of implied warranty are not timely, summary judgment is granted in favor of the defendants on those claims.

### C. Successor Liability

The plaintiff contends that defendant Tenneco Resins, Inc. ("TRI") succeeded to the Thorotrast liabilities of Heyden Newport when TRI (then HDN Corporation) purchased Heyden Newport's assets in 1963. The defendants argue that Delaware law recognizes no successor liability theory that would permit suit against TRI on a tort claim allegedly arising out of sales of Thorotrast by Heyden Chemical Corporation. Under Delaware conflicts of law rules, the legal effect of a sale of assets transaction is determined by the law of the state with the most significant relationship to the transaction. *In re Asbestos Litigation (Bell)*, 517 A.2d 697, 699 (Del.Super. 1986); *Walsh v. Newark Day Nursery Assn.*, C.A. No. 82C-MR-127, slip op. at 2 (Del.Super. Jan. 28, 1985). Here, that state is Delaware, and the parties agree Delaware law should apply on the issue of successor liability.

The general rule is that, when one company sells or transfers all of its assets to another, the purchaser does not become liable for the debts and liabilities, including torts, of the transferor. *Polius v. Clark Equip. Co.*, 802 F.2d 75, 77 (3d Cir.1986); *Fehl v. S.W.C. Corp.*, 433 F.Supp. 939, 945 (D.Del.1977). However, a purchaser may be liable for the obligations of the selling corporation in any one of the following four situations: (1) the purchaser expressly or impliedly assumes such obligations; (2) the transaction amounts to a consolidation or merger of the seller into the purchaser; (3) the purchaser is merely a continuation of the seller; or (4) the transaction has been entered fraudulently. *Knapp v. North American Rockwell Corp.*, 506 F.2d 361, 363-64 (3d Cir.1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975); *Fehl*, 433 F.Supp. at 945 (applying Delaware law); *In re Asbestos Litigation (Bell)*, 517 A.2d 697, 699 (Del.Super.1986) (applying Pennsylvania law).

#### 1. Express or Implied Assumption of Liability

■ A buyer may be found to have expressly or impliedly assumed the selling corporation's liability. *Fountain v. Colonial Chevrolet Co.*, C.A. No. 86C-JA-117, slip op. at 7 (Del.Super. April 13, 1988) [available on WESTLAW, 1988 WL 40019]. The plaintiff contends that summary judgment should be denied because the terms of the liability provisions of the 1963 Plan of Reorganization and Assumption Agreement are ambiguous. The defendants ar-

gue that the agreement is clear and that HDN, in the 1963 acquisition, assumed only the liabilities that were disclosed by Heyden Newport and that existed at the closing date. The Court finds that there is a question of fact as to what liabilities were assumed in the 1963 transaction.

As set forth in Section 5.3 of the 1963 Plan, HDN assumed, subject to conditions set forth in the Plan, all liabilities of Heyden Newport that existed at the closing date, whether accrued, absolute, contingent or otherwise. One of the conditions was that Heyden Newport provide a complete listing of its absolute or contingent liabilities and pending or threatened claims or litigation.[3] The complete listing was contained in the schedule of litigation, the schedule of liabilities and the unaudited Consolidated Balance Sheet of Heyden Newport and its subsidiaries as of March 31, 1963. These documents were updated as of the closing date. Neither the two schedules nor the Consolidated Balance Sheet nor the certificates contained any reference to Heyden's manufacture of Thorotrast.

The question, then, is whether any liability arising from Mr. Elmer's alleged Thorotrast injection was included when HDN agreed to assume "all ... liabilities of Heyden of any kind ... whether accrued ... contingent or otherwise ... exist[ing] at the Closing Date." While it seems clear that there was no express assumption of this liability, the Court finds that there is a question whether HDN impliedly assumed any Thorotrast liability of Heyden. *See Gee v. Tenneco, Inc.*, 615 F.2d 857, 863 (9th Cir.1980) (Tenneco documents reasonably susceptible to conflicting interpretations); *Bouley v. American Cyanamid*, C.A. No. 85–4368–Z, slip op. at 13 [available on WESTLAW, 1987 WL 18738] (D.Mass. October 21, 1987) (reasonable persons may differ as to meaning of 1963 contract). It

could reasonably be inferred from the documents of the 1963 Plan, especially Section 5.3, that HDN agreed to assume any and all liabilities of Heyden, regardless of the contents of the schedules and balance sheets. *Gee*, 615 F.2d at 863. Because there exists a genuine issue of material fact as to what liabilities HDN assumed, summary judgment must be denied.

Defendants further argue that, even if HDN assumed liabilities other than those listed, HDN could not have assumed liability for plaintiff's claims because they did not exist in 1963. Plaintiff asserts that Mr. Elmer had an "unaccrued claim" against Heyden Newport at the time of the 1963 transaction and that liability for this claim passed to HDN. There is a certain metaphysical quality to a semantic debate over when a potential claim becomes a "liability." Suffice it to say that, whether the Court applies the law of New York, where the 1963 Plan was executed, or the law of Delaware, where the companies were incorporated, there existed in 1963 a contingent or potential liability that HDN could reasonably be found to have assumed.

### 2. Consolidation or Merger of Seller into the Purchaser

The plaintiff has not alleged that there was a consolidation or that Heyden Newport was merely merged into HDN.

### 3. Purchaser as Continuation of Seller

The plaintiff contends there is also a material issue of fact regarding whether TRI was a mere continuation of Heyden Newport. *See Knapp v. North American Rockwell Corp.*, 506 F.2d 361 (3d Cir.1974); *Shannon v. Samuel Langston Co.*, 379 F.Supp. 797(W.D.Mich.1974). In support of her argument, the plaintiff points out that HDN was formed for the sole purpose of acquiring the assets of Heyden Newport and that HDN continued the business and

---

**3.** Paragraph 1.6 provided:

Except as listed in the schedule which Heyden has heretofore delivered to HDN and Tennessee [Gas Transmission Company], at March 31, 1963 neither Heyden nor any of the Subsidiaries had any liabilities, absolute or contingent (other than inter-company liabilities), which are not shown or provided for on the

unaudited Consolidated Balance Sheet of Heyden and its Subsidiaries as of March 31, 1963....

Paragraph 1.13 provided that a schedule of claims or litigation was to be provided and that, except for those items listed in the schedule, there were no other pending actions, suits, etc.

maintained the employees of Heyden Newport. Also, the officers of Heyden Newport became the officers of HDN, and Heyden Newport stockholders became stockholders of TGT. Despite these facts, the Court finds that TRI cannot be held liable under the continuation theory of successor liability.

Delaware courts have narrowly construed the continuation theory. *Fountain,* slip op. at 8; *Fehl,* 433 F.Supp. at 946. In order to recover under this theory in Delaware, it must appear that the former corporation is the same legal entity as the latter; that is, "it must be the same legal person, having a continued existence under a new name." *Fountain,* slip op. at 8. The test is not the continuation of the business operation, but rather the continuation of the corporate entity. *Id.*

The Heyden Newport–HDN transaction was more than a mere reorganization or change of corporate name. The sale was an arms length transaction to the extent that consideration in the form of TGT stock was paid. HDN had different owners than Heyden Newport. Finally, the Thorotrast business was not continued by HDN or TRI, as that business had been sold in 1953. Under these facts, it cannot be said that HDN and Heyden Newport were "the same legal person."

### 4. Fraudulent Transaction

The plaintiff has not alleged that the Heyden Newport–HDN transaction was fraudulent or that it was an attempt to evade any Thorotrast liability.

### D. Claims Against Tenneco Inc.

■ The plaintiff asserts that Tenneco Inc. (formerly Tennessee Gas Transmission Company), as the parent of TRI (formerly HDN), should be held liable for TRI's activities, including TRI's alleged succession to Heyden Newport's Thorotrast liabilities. The basis for her claim against Tenneco Inc. is its role in the 1963 purchase of Heyden Newport's assets. The defendant argues that there is no evidence that Tenneco Inc. was the agent of TRI or that TRI was a mere instrumentality of Tenneco Inc. Because the Court finds that there is evi-

dence from which a jury could reasonably conclude that Tenneco Inc. dominated TRI, or acted as the agent of TRI, summary judgment on this issue is denied.

A parent corporation may be held liable for the activities of its subsidiary under application of general agency principles. *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.,* 842 F.2d 1466, 1477 (3d Cir.1988). Delaware agency law is consistent with the general common law in this regard. *Id.* at 1477 n. 4. The general rule is that a parent corporation may be held liable for the torts of its subsidiary if the parent exercises such dominion and control over the subsidiary that it can only be viewed as a mere instrumentality of the parent. *Advocat v. Nexus Industries, Inc.,* 497 F.Supp. 328, 334 (D.Del.1980).

The plaintiff has alleged and offered proof of facts sufficient to create a question of fact as to Tenneco Inc.'s derivative liability. TGT was responsible for the negotiation and preparation of the 1963 Plan, and it incorporated HDN for the purpose of receiving Heyden Newport assets. Prior to receiving the business and assets of Heyden Newport at the closing, HDN had no assets other than its rights under the 1963 Plan. TGT and TRI shared some common officers and directors after the closing on October 4, 1963. The testimony in the *Bouley* case of Harold E. Daniels, former vice president of TGT, sufficiently creates a factual issue as to the relationship of the two companies. *See Bouley,* slip op. at 16.

### E. Duty to Warn

■ Because neither TRI nor HDN manufactured or distributed Thorotrast, the plaintiff does not allege that TRI had an independent duty to warn Mr. Elmer or his physician of its dangers. However, the plaintiff does allege that the defendants had a *continuing* duty to warn as successors to Heyden Newport. The plaintiff bases this allegation on the fact that Tenneco has been sued elsewhere for injuries arising from the use of Thorotrast and its assertion that TRI and Tenneco must have

been aware of the dangers of Thorotrast as early as 1963.

A rule of law imposing successor liability based on a continuing duty to warn has not been expressly adopted in Delaware. *Fountain,* slip op. at 10. However, it has been adopted in other jurisdictions in cases involving a subsequent relationship between the successor and customers of the predecessor corporation. *See Tucker v. Paxson Machine Co.,* 645 F.2d 620 (8th Cir.1981); *Gee v. Tenneco, Inc.,* 615 F.2d 857 (9th Cir.1980).

While the courts have not been entirely clear in distinguishing between an independent duty to warn and a continuing duty to warn, imposition of a continuing duty to warn on TRI and TGT would be contrary to Delaware law. Succession alone does not generate a duty to warn. *Polius,* 802 F.2d at 84. Whatever the merits of the breach of a duty to warn theory, this Court is not prepared to adopt a new theory of recovery absent guidance from the Delaware courts or legislature. *See Fountain,* slip op. at 10. Therefore, defendants' motion for summary judgment with respect to plaintiff's causes of action based on the alleged failure of TRI and TGT to warn is granted.

*F. Prima Facie Case*

█ The defendants have vigorously argued in their briefs and at oral argument that there is no admissible evidence sufficient to prove that Heyden Chemical Corporation manufactured or distributed the Thorotrast that was found in Mr. Elmer's body and that the plaintiff cannot establish a prima facie case. While the plaintiff concedes that she cannot produce the contemporaneous medical record of Mr. Elmer's Thorotrast injection because the Veterans' Administration hospital records were destroyed in a fire, she contends that she has produced admissible circumstantial evidence from which a jury can conclude that Heyden Chemical Corporation manufactured and distributed the Thorotrast that was administered to Mr. Elmer in the District of Columbia in 1952. Notably, the parties agree for the purposes of this motion that there were deposits of Thorotrast

in Mr. Elmer's liver and that the Thorotrast caused his death. The plaintiff acknowledges, though, that she does not know the actual date of the injection, but is relying on deposition testimony, medical records and her affidavit.

To assert a claim against the defendants based on negligence, the plaintiff must establish that the defendants owed the plaintiff (or her decedent) a duty and that the defendants by their conduct breached that duty, proximately causing damage to the plaintiff. W. Keeton, *Prosser on Torts* § 30 (5th ed. 1984); *Pahanish v. Western Trails, Inc.,* 69 Md.App. 342, 517 A.2d 1122, 1128 (1986). To assert a claim for strict liability under Maryland or District of Columbia law, the plaintiff must demonstrate, *inter alia,* that the product was in a defective condition at the time it left the seller's control. *Restatement (Second) of Torts,* § 402A (1965); *Phipps v. General Motors Corp.,* 278 Md. 337, 363 A.2d 955, 958 (1976); *Payne v. Soft Sheen Products, Inc.,* 486 A.2d 712, 720 (D.C.App.1985).

There is no requirement, though, that the plaintiff produce direct evidence of the circumstances surrounding the Thorotrast injection. She may satisfy her burden of proof at trial by producing circumstantial evidence. *McCormick on Evidence* § 337 (E.Cleary 3d ed. 1984); *District of Columbia v. Savoy Const. Co.,* 515 A.2d 698, 708 n. 12 (D.C.App.1986); *Matter of Langmeier,* 466 A.2d 386, 402 (Del.Ch.1983). Circumstantial evidence can have probative value equal to that of direct, or testimonial, evidence. *Id.*

Of course, that circumstantial evidence must be admissible. When a motion for summary judgment is made, an adverse party may not rest on mere allegations or denials of its pleadings. Rather, the adverse party's response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). A party may not seek to defeat a motion for summary judgment based on an affidavit that contains only hearsay statements. *Wilson v. Pala Management Corp.,* C.A. No. 86C–JA–109, slip. op. at 2 [available on WESTLAW, 1988

WL 55310] (Del.Super. May 10, 1988). The Court may rely on only those facts in the affidavit that are within the personal knowledge of the affiant and would be admissible into evidence. *Id.* at 3 (citing *Woodcock v. Udell,* 97 A.2d 878 (Del.Super. 1953)). When the plaintiff, because of the inadmissibility of certain evidence, is unable to make any adequate showing concerning an essential element of her case, summary judgment may be appropriate. *Wilson,* slip op. at 3; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The plaintiff has identified several records that she suggests would support a conclusion that Mr. Elmer received Thorotrast during neck surgery in 1952. These include: (a) a medical history, handwritten and signed by Mr. Elmer on April 22, 1965, in which he stated that he had an operation for an "arterial venus [sic] fistual"[4] of the left neck in 1952; (b) a medical progress note dated December 16, 1969 at which time Mr. Elmer apparently complained of "chills and sweats ... and pains in neck at region of surgery for A–V fisula (at VA Hosp. in '52)"; (c) an admission history and physical, dated August 19, 1980, taken from Mr. Elmer by Dr. R.O. Biern and during which Mr. Elmer related that he had undergone an "injection of an AV fistula in the neck in 1952"; and (d) a gastroenterology consultation, dated October 11, 1984, taken from Mr. Elmer by Dr. Michael N.

Peters and during which Mr. Elmer allegedly related that he "had Thorotrast in 1952 as part of a work up for a suspected arteriovenous malformation in the left side of his neck."

Additionally, the plaintiff notes that George A. Elmer, Mr. Elmer's son, testified in his deposition that he visited his father at the Mt. Alto Veterans' Administration Hospital in Washington, D.C. in 1953, where Mr. Elmer underwent "an operation to remove or to correct a noise that was in his ear." Upon further questioning, Mr. Elmer's son stated that he "[c]ould be a year off" as to the date.

The defendants argue that the statements allegedly made by Mr. Elmer in the medical records are hearsay and thus inadmissible. They anticipate that the plaintiff will seek to have the records admitted under either Federal Rule of Evidence 803(4) (statements for purposes of medical diagnosis or treatment) or 803(6) (records of regularly conducted activity).[5] Rule 803(6) is unavailing, according to the defendants, because a plaintiff's recitation of his medical history is not information " 'transmitted by a person with knowledge' acting 'in the course of a regularly conducted business'." *Petrocelli v. Gallison,* 679 F.2d 286, 290–91 (1st Cir.1982). The Court agrees that Rule 803(6) is not, by itself, grounds for admitting the medical records here. As the *Petrocelli* court noted, "Where the declar-

---

**4.** An arteriovenous fistula (AV fistula) is "an abnormal communication between an artery and a vein, usually resulting in the formation of an arteriovenous [dilation]." Stedman's Medical Dictionary 534 (5th ed. 1984). In layman's terms, it is a malformation in an area where a vein and artery come together.

**5.** Rule 803(4) states that the following are not excluded by the hearsay rule, even though the declarant is available as a witness:

Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Fed.R.Evid. 803(4).

Similarly, Rule 803(6) creates an exception for the following:

Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Fed.R.Evid. 803(6).

ant is a hospital patient, his relating of his own history is not part of a 'business' routine in which he is individually a regular participant." 679 F.2d at 290; *see also Ricciardi v. Children's Hosp. Medical Center*, 811 F.2d 18, 22–23 (1st Cir.1987).

However, *Petrocelli* is distinguishable. In that case the plaintiff argued for the admissibility of certain hospital records solely on 803(6) grounds, and the case involved "a rather narrow issue regarding the admissibility under rule 803(6) of a business record which is so cryptic that pure guesswork and speculation is required to divine the source of the cited information." 679 F.2d at 291. The plaintiff did not, presumably for strategic reasons, argue that the records were admissible as patient history under 803(4). *Id.*

In the present case, the plaintiff asserts *both* Rule 803(6) and Rule 803(4). Mr. Elmer's statements concerning his 1952 operation and the alleged Thorotrast injection were certainly "made for purposes of medical diagnosis or treatment. . . ." The Court finds that the disputed medical records are likely to be admissible under a combination of 803(6) and 803(4).[6] Rule 805 provides that "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." F.R.Evid. 805. Mr. Elmer's statements to medical personnel regarding the 1952 operation arguably fall within 803(4), and the medical records themselves likely fall within 803(6). Notably, the *Petrocelli* court specifically acknowledged the viability of this theory of admissibility. 679 F.2d at 291 n. 5.

The defendants further argue that use of 803(6) is precluded because the source of the notations in the medical records is un-

known. This statement is inaccurate. Both Dr. Biern and Dr. Peters testified that the source of the notations on which plaintiff relies was Mr. Elmer himself.

The defendants place final reliance on *Wilson v. Pala Management Corp.*, C.A. No. 86C–JA–109, slip op. at 2–3 (Del.Super. May 10, 1988). In that case, the Delaware Superior Court granted the defendant's motion for summary judgment on the grounds that the plaintiff had failed to establish sufficient evidence that the plaintiff fell on the defendant's premises. *Id.* at 3–4. In so holding, the *Wilson* court noted that "plaintiff's case suffers from absence of any evidence showing that plaintiff fell at defendant's premises or that he fell under conditions which constituted breach of duty by defendant." *Id.* at 2–3.

Unlike the plaintiff in *Wilson*, the plaintiff here has come forward with at least some admissible evidence from which a jury could conclude that Mr. Elmer received a Thorotrast injection in 1952 and that Heyden, because it was the sole U.S. manufacturer of the drug prior to 1954, manufactured that Thorotrast.[7] Summary judgment is inappropriate where "there is any reasonable hypothesis upon which the non-moving party might recover, or if there are material facts in dispute or inferences to be drawn therefrom." *Wilson v. Joma, Inc.*, 537 A.2d 187, 188 (Del.1988). Such is the situation here, and the motion of defendants TRI and Tenneco Inc. for summary judgment on plaintiff's claims of negligence and strict liability is therefore denied.

---

**6.** The Court is not required at this stage of the litigation to make a final ruling on the admissibility of the plaintiff's proffered evidence, and it reserves the right to rule definitively on the evidence at pretrial or trial. Between now and the time of trial, further facts, which will potentially affect the Court's ultimate ruling, may come to light.

**7.** The defendants allege in their opening brief that Mr. Elmer lived in Germany from October of 1954 through the winter of 1960–1961. They

argue that Mr. Elmer could have received an injection of Thorotrast during that period, and that any such Thorotrast would not have been manufactured or distributed by Heyden Chemical Corporation. While this scenario is certainly possible, the defendants have come forward with no evidence to substantiate the claim. Absent such evidence, the defendants' mere allegation is insufficient grounds for granting summary judgment.