CHESAPEAKE UTILITIES CORPORATION, Plaintiff,

v.

AMERICAN HOME ASSURANCE COMPANY, et al., Defendants.

Civ. A. No. 86–501–JLL.

United States District Court, D. Delaware.

Jan. 9, 1989.

William A. Denman and Douglas B. Catts of Schmittinger & Rodriguez, P.A., Dover, Del., for plaintiff Chesapeake Utilities Corp.

William F. Taylor and Anthony G. Flynn of Young, Conaway, Stargatt and Taylor, Wilmington, Del.; James P. Schaller, M. Elizabeth Medaglia, and Richard W. Bryan of Jackson & Campbell, P.C., Washington, D.C., of counsel, for defendant American Home Assur. Co.

James W. Semple of Morris, James, Hitchens & Williams, Wilmington, Del., for defendant Hartford Acc. and Indem. Co.

Richard W. Pell of Tybout, Redfearn, Casarino & Pell, Wilmington, Del.; Eileen B. Eglin and J. Marks Moore, III of Wilson, Elser, Moskowitz, Edelman & Dicker, Baltimore, Md., of counsel, for defendant Bellefonte Ins. Co.

David R. Hodas of Potter, Carmine & Hodas, Wilmington, Del.; Mary Kay Vyskocil and Andrew Amer of Simpson, Thacher & Bartlett, New York City, of counsel, for defendant Travelers Indem. Co.

J.R. Julian, Wilmington, Del.; Thomas J. Quinn, John S. Spadaro, and Mary Ann D'Amato of Mendes & Mount, New York City, of counsel, for defendant London Market Insurers.

John G. Mulford of Theisen, Lank, Mulford & Goldberg, Wilmington, Del.; James W. Greene of Bromley, Brown & Walsh, Washington, D.C., of counsel, for defendant Continental Cas. Co.

Robert K. Payson of Potter, Anderson & Corroon, Wilmington, Del.; Michael Harwood and Douglas M. Parker of Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, of counsel, for defendant Stone & Webster Management Consultants, Inc.

Kevin Gross of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, Del.; Roger E. Warin and Karen E. Rochlin of Steptoe & Johnson, Washington, D.C., of counsel, for defendant Home Ins. Co.

Edward McNamara and Robert J. Taylor of Barros, McNamara & Scanlon, P.A., Dover, Del., for defendant Associated Elec. and Gas Ins. Services, Inc.

Edmund D. Lyons, Jr. of Aerenson, Ferrara & Lyons, Wilmington, Del.; Dennis M. Flannery, A. Stephen Hut, Jr., and Michael C. Small of Wilmer, Cutler & Pickering, Washington, D.C., of counsel, for defendant Ins. Co. of North America.

## REVISED MEMORANDUM OPINION

LATCHUM, Senior District Judge.

## I. INTRODUCTION

This diversity action arises out of environmental contamination claims asserted by governmental entities against plaintiff Chesapeake Utilities Corporation ("Chesapeake"). (Docket Item ["D.I."] 152 at 7–11.) Chesapeake alleges that as a result of these environmental claims, it was forced to incur certain costs for which it sought recovery from various insurance companies ("defendants" or "insurers") which had written liability insurance policies for Chesapeake. (D.I. 152 at 1.) After these insurers refused to defend and indemnify Chesapeake for the environmental claims, Chesapeake brought this action against the insurers seeking damages and declaratory relief.[1] (D.I. 80 at ¶¶ 21, 69; D.I. 152 at 1.)

Presently before the Court are summary judgment motions filed by seven of the defendant insurers.[2] For the reasons set forth in this Memorandum Opinion, the insurers' motions will be denied in all respects.

## II. FACTS

Chesapeake's predecessors[3] formerly operated two coal gas manufacturing facilities—one at Salisbury, Maryland, and the other at Dover, Delaware. Chesapeake's disposal of coal tar, a by-product of the coal gas manufacturing process, gave rise to the environmental claims which underlie the instant litigation.

At the Salisbury, Maryland site, Chesapeake manufactured coal gas during the period 1907 through 1950. (D.I. 152 at 6.) In 1950, the operations at the Maryland site were converted from coal gas to propane gas. *Id.* Pursuant to the conversion, portions of the facility were dismantled and an unspecified quantity of coal tar was left at the site. *Id.* at 6–7.

In 1984 the State of Maryland placed the Maryland site on a list of potentially hazardous waste sites.[4] (D.I. 152 at 7.) After conducting a preliminary on-site assessment, the State recommended a more thorough investigation with appropriate soil sampling. (D.I. 80 at ¶ 61; D.I. 152 at 8; D.I. 152A at 69.) The State also allegedly demanded that Chesapeake undertake, at its own expense, a groundwater investigation of the site. (D.I. 80 at ¶ 68; D.I. 152 at 8; D.I. 152A at 109.) Under pressure from the State of Maryland,[5] Chesapeake

---

**1.** The following nine insurers have been named as defendants: American Home Assurance Company; Bellefonte Insurance Company; The Hartford Accident and Indemnity Company; The Travelers Indemnity Company; Lloyds Underwriters and London Market companies ("London Market Insurers"); Continental Casualty Company; The Home Insurance Company; Associated Electric and Gas Insurance Services, Inc. ("AEGIS"); and Insurance Company of North America ("INA"). (D.I. 80 at ¶¶ 4–12, 81.)

**2.** Only Travelers Indemnity Company and Continental Casualty Company among the defendant insurers have not moved for summary judgment at this time. (*See* D.I. 137; D.I. 165.)

**3.** Chesapeake's predecessors are the Dover Gas Light Company and the Citizens Gas Company. These two entities were merged into Chesapeake on January 15, 1960. (D.I. 152 at 5.) For purposes of this opinion, Chesapeake and its affiliates are collectively referred to as Chesapeake.

**4.** The list was published by the Maryland State Waste Management Administration, which oversees the Maryland Superfund Program. (*See* D.I. 152A at 44–45, 61, 69.)

**5.** The record does not indicate that the State of Maryland brought any lawsuit against Chesapeake. Nevertheless Chesapeake's remedial actions appear to have been coerced; not voluntary. Presumably the State could, if necessary, have required Chesapeake to take the remedial measures under authority of either its Superfund Program or the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* In any event the defendant insurers have not, for purposes of the instant motions, alleged that Chesapeake's clean-up activities were voluntary or unnecessary.

hired an outside consultant and incurred various costs in an effort to remedy the pollution at the site. (D.I. 80 at ¶¶ 60–68; D.I. 152 at 7–8.)

As for the Dover, Delaware site, a decision was made in 1948 to dismantle the coal gas plant.[6] (D.I. 131A at 14; D.I. 152 at 5.) In the process of demolishing the coal gas plant, quantities of coal tar were buried at the site. (D.I. 152 at 6.) The site of the coal gas plant was conveyed to the State of Delaware in 1949 (D.I. 80 at ¶ 14; D.I. 152 at 6; D.I. 152A at 1–7), and much later was selected by the State as the location for a new Family Court building. (D.I. 80 at ¶ 16; D.I. 152 at 9–10.) During an inspection of the site in preparation for construction of the Family Court building, the State discovered waste materials in the soil and groundwater. (D.I. 80 at ¶ 16; D.I. 152 at 8–9.)

In contrast to the Maryland site—where Chesapeake incurred clean-up costs at the direction of the State of Maryland—the State of Delaware itself incurred expenses in monitoring and cleaning up the Dover site. (*See* D.I. 152 at 9; D.I. 152A at 41.) The State of Delaware asserted claims against Chesapeake, seeking reimbursement for past costs incurred by the State, and contending that Chesapeake would be liable for any future clean-up costs.[7] (D.I. 80 at ¶¶ 17–20; D.I. 152 at 8–9.) According to the State, the legal bases for Chesapeake's liability included: 7 *Del. Code* § 6308; CERCLA; negligence; strict liability; trespass; and nuisance. (D.I. 80 at ¶ 18; D.I. 152 at 9; D.I. 152A at 38.)

On February 21, 1986, Chesapeake and the State of Delaware entered into a settlement agreement, under the terms of which Chesapeake paid $200,000 to the State.

(D.I. 80 at ¶ 22; D.I. 152 at 9–10; D.I. 152A at 74–83.) This sum represented reimbursement to the State for certain response costs, and the release of Chesapeake from any claims resulting from the State's acquisition of the site, or for construction delays, diminution of fair market value, attorneys fees, interest or punitive damages. (D.I. 80 at ¶ 22; D.I. 152 at 9–10.) The settlement agreement did not, however, relieve Chesapeake of any potential liability for future environmental assessments or remedial actions. (D.I. 80 at ¶ 23; D.I. 152 at 10; D.I. 152A at 77.)

In addition to the State of Delaware, the United States Environmental Protection Agency ("EPA") also investigated the Dover site. (D.I. 152 at 10–11.) The EPA has threatened to hold Chesapeake liable for remedial actions at the site, including investigation, planning, clean-up, and enforcement measures. (D.I. 152A at 112–116.)

Chesapeake allegedly notified the defendant insurers of the above claims (brought by the States of Maryland and Delaware and by the EPA), and requested the insurers to defend and indemnify Chesapeake on the claims. (D.I. 80 at ¶¶ 21, 69; D.I. 152 at 1.) Following the insurers' refusal to defend and indemnify, Chesapeake brought this action seeking damages and declaratory relief. (D.I. 152 at 1.)

The insurers have denied coverage and now move for summary judgment based upon their reading of certain language present in the liability insurance contracts. The INA policies are illustrative:[8]

> [The insurer shall pay] on behalf of the insured all sums which the insured shall become obligated to pay by reason of liability for *damages* because of injury to or destruction of property, including the

---

**6.** At approximately the same time, a propane gas facility was constructed at a different location within Dover. (D.I. 152 at 5–6; D.I. 152A at 135.)

**7.** As with the Maryland site, apparently no lawsuits have been brought by the State of Delaware against Chesapeake. All claims asserted by the State have, to date, been out of court.

**8.** All of the defendant insurers have, to some degree, referred to INA's brief and relied upon

its arguments. (*See* D.I. 143 at 3–4, 7–8 (American Home Assurance Company); D.I. 139 at 3, 5–6, 8 (Bellefonte Insurance Company); D.I. 144 at 2 (The Hartford Accident and Indemnity Company); D.I. 141 at 3–4, 13–15 (London Market Insurers); D.I. 136 at 1–3 (The Home Insurance Company); D.I. 134 at 1–2, 4–5 (AEGIS).) References throughout this opinion are made to the INA briefs and insurance policies. Unless otherwise indicated, the Court's analysis of INA's arguments applies equally to the other defendant insurers.

loss of use thereof, caused by accident and arising out of the *operations* of the insured as defined herein.

(D.I. 131A at 43, 58 (emphasis added).)

Based upon the foregoing contractual language the defendants posit three arguments in support of their summary judgment motions. First, with respect to the Maryland site, the insurers argue that Chesapeake's clean-up activities are *equitable* remedies, not legal *damages*, and hence under Maryland law they are not covered. (D.I. 131 at 3.) This first argument, which is founded upon *Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d 1348 (4th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988), is discussed in part III.B. of this opinion, *infra*.

Secondly, defendants raise a similar argument regarding the Delaware site—that is, that clean-up costs are not covered "damages" but rather are a form of equitable relief. (D.I. 131 at 3–4.) This argument, as defendants correctly state, would require the Court to revisit its recent interpretation of Delaware law in *New Castle County v. Hartford Accident and Indemnity Co.*, 673 F.Supp. 1359 (D.Del.1987). The defendants' second argument is addressed in part III.C.2. of this opinion, *infra*.

The defendants' third and final argument relates only to the Delaware site, not the Maryland site. The insurers agreed to cover Chesapeake's liability for losses "arising out of the *operations* of the insured as defined herein." (D.I. 131A at 43, 58 (emphasis added).) The policies then proceed to define operations as "the manufacture, distribution and sale of enriched propane gas...." (D.I. 152A at 60, 77.) Defendants emphasize that coal tar—the source of pollution at the Delaware site—is a by-product of *coal* gas production, but not of *propane* gas production. (D.I. 131 at 14–15.) Hence, say defendants, claims arising from the burial of coal tar fall beyond the scope of "operations" as defined in the policies, and are not covered. *Id.* The Court considers this argument in part III. C.1. of the opinion, *infra*.

## III. ANALYSIS

### A. *Choice Of Law*

#### 1. *Where Contract Is Silent*

■ As a threshold matter, the Court must decide which law governs this dispute. In diversity cases such as this one, a federal court refers to the law which would be applied by a court of the state in which it sits. *Erie R.R. v. Tompkins*, 304 U.S. 64, 77–78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). The reference to state law—Delaware law in this case—includes the state's choice of law rules. *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941).

In contract cases, Delaware courts have moved away from the traditional rule that the law of the place of contract formation governs, in favor of the more modern and flexible "most significant relationship" test of the Restatement (Second) of Conflict of Laws § 188 (1971). *Whiteside v. New Castle Mutual Insurance Co.*, 595 F.Supp. 1096, 1098 (D.Del.1984); *Hill v. Equitable Trust Co.*, 562 F.Supp. 1324, 1334 (D.Del. 1983); *Process and Storage Vessels, Inc. v. Tank Service, Inc.*, 541 F.Supp. 725, 729 (D.Del.1982), *aff'd*, 760 F.2d 260 (3d Cir. 1985); *see Oliver B. Cannon & Son, Inc. v. Dorr–Oliver, Inc.*, 394 A.2d 1160, 1166 (Del.1978).

Section 188 of the Restatement provides guidance for determining choice of law in a contract dispute where the contract itself is silent as to which law applies.[9] "The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the *most significant relationship* to the transaction and the parties...." Restatement (Second) of Conflict of Laws § 188(1) (emphasis added).

---

**9.** Chesapeake argues that the insurance policies issued by AEGIS and by London Market Insurers contain choice of law provisions. This argument is addressed in part III.A.2. of this opinion, *infra*. None of the other insurance policies at issue in this case contain choice of law provisions.

In evaluating which state has the "most significant relationship," courts are to consider: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. Restatement (Second) of Conflict of Laws § 188(2). The court in *Whiteside v. New Castle Mutual Insurance Co.* stated that, "[a]lthough the information presented concerning factors (a), (b), (c), and (e) is equivocal, *the crucial factor in a property insurance dispute is the location of the insured property....*" 595 F.Supp. at 1098 (emphasis added).

In this case also, the evidence presented concerning factors (a), (b), (c) and (e) is conflicting. And although *Whiteside v. New Castle Mutual Insurance Co.* involved a property insurance policy, whereas here the Court must interpret liability insurance policies, there appears to be no reason why the same analysis should not apply to both.[10] Accordingly, the Court will apply the law of the location of the subject matter of Chesapeake's liability insurance policies. Relevant here are Chesapeake's past and present operations in Ma-

ryland and in Delaware. Hence the law of Maryland will control claims based upon pollution at the Maryland site. Meanwhile the claims arising from contamination of the Delaware site will be resolved under Delaware contract law.

The same conclusion as above would also follow from application of Restatement (Second) of Conflict of Laws § 193, which is perhaps even more to the point than § 188.[11] Whereas § 188 announces choice of law principles in contract disputes generally, § 193 specifically dictates choice of law in insurance disputes.[12] "The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy...." Restatement (Second) of Conflict of Laws § 193. Applying § 193 therefore yields an analysis identical to that produced under § 188 in insurance cases:

*The location of the insured risk will be given greater weight than any other single contact* in determining the state of the applicable law provided that the risk can be located, at least principally, in

10. *See also* Restatement (Second) of Conflict of Laws § 188, comment e, at 580–81.

*Situs of the subject matter of the contract.* When the contract deals with a specific physical thing, such as land or a chattel, or affords protection against a localized risk, such as the dishonesty of an employee in a fixed place of employment, the location of the thing or of the risk is significant.... Indeed, when the thing or the risk is the principal subject of the contract, it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the thing or risk was located would be applied to determine many of the issues arising under the contract.

*Id.* (emphasis in original). Thus the location of the risk is of primary importance not only in the *property* insurance context, as in *Whiteside v. New Castle Mutual Insurance Co.,* but also in the *fidelity* insurance situation mentioned in the Restatement commentary. The same logic applies with equal force to *liability* insurance.

11. Although the Delaware state courts are yet to have occasion to cite § 193, this Court sitting in diversity and applying Delaware law has followed § 193. *See Whiteside v. New Castle Mu-*

*tual Insurance Co.,* 595 F.Supp. at 1098. There is no indication that the Delaware state courts, which relied upon § 188 in *Oliver B. Cannon & Son, Inc. v. Dorr–Oliver, Inc.,* 394 A.2d 1160, 1166 (Del.1978), would adopt the Restatement's contract rules in a piecemeal fashion, embracing some provisions while discarding others. *Cf. Process and Storage Vessels, Inc. v. Tank Service, Inc.,* 541 F.Supp. 725, 729 (D.Del.1982) (another diversity case interpreting Delaware law, wherein this Court broadly observed that "it is to the Restatement [ (Second) of Conflict of Laws] that this Court must now turn in deciding the choice of law issue").

12. The scope of § 193 is set forth in comment a:

The rule of *this Section applies to* contracts of fire insurance, surety insurance and the various kinds of casualty insurance, such as theft insurance, *liability insurance,* collision insurance, workmen's compensation insurance and fidelity insurance.

   *     \*     \*     \*     \*     \**

The law selected by application of the present rule determines such questions as ... what risks are covered by the policy.... Restatement (Second) of Conflict of Laws § 193, comment a, at 610 (emphasis added).

a single state.[13] ... The importance of the risk's principal location will also vary somewhat from case to case. It enjoys the greatest significance when an immovable is involved, such as when the risk insured against is damage by fire to a particular building.

Restatement (Second) of Conflict of Laws § 193, comment b, at 611–12 (emphasis and footnote added).

In summary, the claims relating to the Maryland site will be analyzed under Maryland law, while Delaware law will govern those claims pertaining to the Delaware site. This conclusion is independently grounded upon both Restatement § 188 (as applied by the Supreme Court of Delaware in *Oliver B. Cannon & Son, Inc. v. Dorr–Oliver, Inc.*, 394 A.2d at 1166) and Restatement § 193.

### 2. Alleged Choice Of Law Provision Within The Contract

■ The preceding analysis determined the applicable law in the context of liability insurance policies which contain no explicit choice of law provisions. Chesapeake now argues[14] that the policies issued by two of the defendant insurers (AEGIS and London Market Insurers) do indeed contain such choice of law provisions which require the application of Delaware law. (D.I. 208.)

By the terms of these policies, AEGIS and the London Market Insurers agreed to "submit to the jurisdiction of any Court of competent jurisdiction within the United States," and further agreed that all disputes arising under the policies "shall be determined in accordance with the law and practice of such Court." (D.I. 134, Ex. A at 19 (AEGIS policy); D.I. 141A at 32, 53, 68, 147, 191, 206, 230 (London Market Insurers policies).) Chesapeake elected to bring this action in the District of Delaware and therefore, it is argued, contract disputes must "be determined in accordance with the law and practice of" Delaware.

The Court has no doubt that the parties could have agreed in advance upon the law which would govern any subsequent contract dispute. However in this case the parties reached no such agreement. The above-quoted language is part of a service of suit clause. It is not a choice of law provision.

The clause alludes to the "law and practice of such *Court*." It does not say "such *state*" or "such *forum*." The law and practice of this Court, in diversity cases, is to apply the law (*including the choice of law rules*) of the forum state. *Erie R.R. v. Tompkins*, 304 U.S. 64, 77–78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). The AEGIS and London Market Insurers policies thus require this Court to apply Delaware's choice of law rules. This has already been done. In part III.A.1. of this opinion, *supra*, the Court applied Delaware choice of law rules and concluded that claims relating to the Maryland site will be construed under Maryland substantive law, whereas Delaware law will govern those claims pertaining to the Delaware site. The choice of law

---

**13.** The fact that the policies now in question insure against risks located in more than one state is of no consequence:

A special problem is presented by multiple risk policies which insure against risks located in several states. A single policy may, for example, insure dwelling houses located in states X, Y and Z.... Presumably, the courts would be inclined to treat such a case, at least with respect to most issues, as if it involved three policies, each insuring an individual risk.

Restatement (Second) of Conflict of Laws § 193, comment f, at 613–14.

**14.** Chesapeake's argument is raised in a motion for leave to supplement its brief in opposition to the summary judgment motions. (D.I. 208.) This motion for leave to supplement was filed by Chesapeake on October 31, 1988, well after the conclusion of the scheduled period for briefing the summary judgment motions. (*See* D.I. 130.) Chesapeake's tardiness brings to bear Local Rule 3.1 E, which provides that:

No additional briefs, affidavits, or other papers in support of or in opposition to [a] motion shall be filed without prior approval of the Court, except that a party may call to the Court's attention and briefly discuss pertinent cases decided after a party's final brief is filed or after oral argument.

D.Del.R. 3.1 E.

analysis for the AEGIS and London Market Insurers policies is therefore no different than for the other insurance policies in question. Chesapeake's motion for leave to supplement its brief will be denied under Local Rule 3.1 E.[15]

The Court will now address the defendant insurers' arguments in support of their motions for summary judgment on the Maryland and Delaware sites respectively.

### B. The Maryland Site

■ In 1984 the State of Maryland placed Chesapeake's Maryland site on a list of potentially hazardous waste sites. (D.I. 131 at 4; D.I. 152A at 44–45, 69.) Chesapeake retained an outside consultant and incurred other costs, at the state's behest, in cleaning up the site. (D.I. 80 at ¶¶ 60–68; D.I. 152 at 7–8.) After the defendant insurers refused Chesapeake's demand to indemnify it for these costs, Chesapeake brought this action. (D.I. 80 at ¶ 69; D.I. 152 at 1.)

The relief obtained from Chesapeake by the State of Maryland is said to be equitable, rather than legal, in nature. (D.I. 131 at 13; D.I. 166 at 9–10.) The insurance policies here at issue require defendants to pay "all sums which the insured shall become obligated to pay by reason of liability *for damages....*" (D.I. 131A at 43, 58 (emphasis added).) The defendant insurers seize upon the emphasized language ("for damages"). They contend that because Chesapeake incurred costs in providing a form of equitable, remedial relief, such costs cannot be damages[16] and hence are not covered. (D.I. 131 at 12–13; D.I. 166 at 9–12.) Defendants' argument relies heavily upon *Maryland Casualty Co. v. Armco, Inc.,* 822 F.2d 1348 (4th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988), a Fourth Circuit opinion purportedly applying Maryland state law.

*Armco* is a follow-up suit to an action brought by the United States against a corporate polluter. As a result of the action underlying *Armco,*[17] the polluter was forced to expend funds to clean up a toxic waste site, and to reimburse the United States for investigatory and enforcement activities. *Armco,* 822 F.2d at 1350–51. The polluter then sought indemnification from its liability insurance carrier, whereupon the insurer brought a declaratory judgment action denying coverage. The Fourth Circuit agreed with the insurer, "hold[ing] that the claim seeking compliance with regulatory directives of a federal agency, which compliance takes the form of obedience to injunctions and reimbursement of remedial costs, does not constitute a claim for 'damages' under the insurance policy." *Armco,* 822 F.2d at 1350. The court adopted a "legal, technical" definition of the term "damages." *Armco,* 822 F.2d at 1352. "'Damages,' as distinguished from claims for injunctive or restitutionary relief, includes 'only payments to third persons when those persons have a *legal* claim for damages....'" *Id.* (emphasis added) (quoting *Aetna Casualty and Surety Co. v. Hanna,* 224 F.2d 499, 503 (5th Cir.1955)).

■ For the reasons described below, the Court believes that *Armco* misstates Maryland law. Accordingly, this Court declines defendants' invitation to follow *Armco.*[18]

---

**15.** As demonstrated by the Court's holding in parts III.B. and III.C. of this opinion, *infra,* Maryland law and Delaware law are the same, at least with respect to the issues relevant to the instant summary judgment motions. Therefore the Court's denial of Chesapeake's motion for leave to supplement its brief appears to have little practical significance.

**16.** The implication of defendants' argument is that damages are cognizable only in actions at law; never in equity.

**17.** The underlying action is reported as *United States v. Conservation Chemical Company,* 653 F.Supp. 152 (W.D.Mo.1986).

**18.** Despite defendants' admonitions to the contrary (D.I. 166 at 10–12), *Armco* is not binding precedent. *See Aceto v. Zurich Insurance Co.,* 440 F.2d 1320, 1322 (3d Cir.1971); 1A J. Moore, W. Taggart, A. Vestal & J. Wicker, *Moore's Federal Practice,* ¶ 0.309[2] at 3124–25 n. 24 (2d ed. 1987) (citing *Aceto v. Zurich Insurance Co.* for the proposition that a federal appellate court's interpretation of state law is *no more than persuasive authority* in a subsequent action before a federal trial court).

In *Aceto v. Zurich Insurance Co.,* the Third Circuit held that the trial court (the Western District of Pennsylvania) was free to reject a prior Third Circuit interpretation of Pennsylva-

Under Maryland law (as announced by the Maryland Court of Appeals—which the Fourth Circuit, as well as this Court, must follow), words in insurance contracts are given their customary and normal meaning. *DeJarnette v. Federal Kemper Insurance Co.*, 299 Md. 708, 475 A.2d 454, 461 (1984); *National Grange Mutual Insurance Co. v. Pinkney*, 284 Md. 694, 399 A.2d 877, 882 (1979) (quoting *Government Employees Insurance Co. v. DeJames*, 256 Md. 717, 720, 261 A.2d 747, 749 (1970)). Obviously if language in an insurance contract is unambiguous, it will be enforced according to its single plain meaning. If, on the other hand, the language is ambiguous, it is resolved against the insurance company which prepared the contract.[19] *St. Paul Fire & Marine Insurance Co. v. Pryseski*, 292 Md. 187, 438 A.2d 282, 286, 287 (1981) (any ambiguity would be construed in favor of the insureds, notwithstanding that one of the insureds was itself an insurance company); *Truck Insurance Exchange v. Marks Rentals, Inc.*, 288 Md. 428, 418 A.2d 1187, 1191 (1980); *C & H Plumbing and Heating, Inc. v. Employers Mutual Casualty Co.*, 264 Md. 510, 287 A.2d 238, 239 (1972) (quoting *Government Employees Insurance Co. v. DeJames*, 256 Md. at 720, 261 A.2d at 749). Language is deemed ambiguous if, to a *reasonably prudent layman*, it is susceptible to multiple meanings. *St. Paul Fire & Marine Insurance Co. v. Pryseski*, 438 A.2d at 288; *Truck Insurance Exchange v. Marks Rentals, Inc.*, 418 A.2d at 1190; *C & H Plumbing and Heating, Inc. v. Employers Mutual Casualty Co.*, 264 Md. at 515, 287 A.2d at 240 (quoting 1 *Couch on Insurance 2d*, § 15:83 at 824 (1959)).

Crucial then, to the outcome of the summary judgment motions, is the existence (or lack) of ambiguity in the term "damages." The insurance policies in question do not define "damages."

A dictionary definition of "damages" states that the word means: "the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right." Webster's Third New International Dictionary, at 571 (1971). Thus, an ordinary definition of the word "damages" makes no distinction between actions at law and actions in equity.

*New Castle County v. Hartford Accident and Indemnity Co.*, 673 F.Supp. 1359, 1365 (D.Del.1987). At best from the insurers' viewpoint, the Court finds ambiguity in the term "damages." At worst, Chesapeake's

---

nia law. The Court in this action has perhaps even less reason than the trial court in *Aceto* to be bound by the circuit court's prior interpretation of state law. Unlike *Aceto*, this trial court is not within the jurisdiction of the circuit court (here the Fourth Circuit) which rendered the previous construction of state law.

19. In the context of a summary judgment motion, all issues of fact (including the issue of which conflicting interpretation of ambiguous contractual language reflects the parties' intent) must be resolved in favor of the non-moving party—here Chesapeake. *See infra* notes 22–24 and accompanying text. Even outside of the summary judgment context, the general rule is that any ambiguities in an insurance contract are resolved against the insurer which prepared the policy and in favor of the insured. *See, e.g., Government Employees Insurance Co. v. DeJames*, 256 Md. 717, 720, 261 A.2d 747, 749 (1970) (Maryland law); *Hallowell v. State Farm Mutual Automobile Insurance Co.*, 443 A.2d 925, 926 (Del.1982) (Delaware law). However, the general rule may be inapposite where the language in question is *supplied* by the *insured*.

A number of the insurance contracts in this action appear to be standard insurance policies on preprinted forms, so that the general rule of construction against the insurance company would clearly apply. (*See* D.I. 136, Exhibit A [The Home Insurance Company]; D.I. 139A at 1–2, 12–15, 17–18 [Bellefonte Insurance Company]; D.I. 141A at 152–53, 183–84, 196, 223 [London Market Insurers]; D.I. 143A at 1–2, 4–13, 16 [American Home Assurance Company]; D.I. 160A at 1–14 [AEGIS].) Nevertheless, there is at least a suggestion by certain of the defendant insurers that Chesapeake or its agents *drafted* —which is not the same as *negotiated*—language in some of the policies. (D.I. 143 at 9 [American Home Assurance Company]; D.I. 166 at 12–13 n. 20, 17 [INA]; D.I. 181 at 2 [American Home Assurance Company]; D.I. 181A at 144 [same]; D.I. 230 at 8–9 n. 7 [same].) To the extent that Chesapeake drafted the "damages" language (and not merely other language such as the definition of "operations"), the general rule might not apply. Hence it would be premature for the Court to rule as a matter of law, at this time, that the term "damages" will be construed against those defendant insurers which allegedly did not supply that language.

version of "damages" is unambiguous and comports with that word's plain meaning. Any definition of "damages" which is grounded upon the ancient division between law and equity—such as the definition now proffered by the insurers—would hardly be an "ordinary and accepted meaning" in the eyes of a "reasonably prudent layperson." *See Pacific Indemnity Co. v. Interstate Fire & Casualty Co.,* 302 Md. 383, 488 A.2d 486, 488 (1985).

Assuming *arguendo* that there is ambiguity in the insurance contracts, Maryland law requires that the ambiguity be construed against the insurance company defendants which supplied the language. *A* reasonable (if not *the* reasonable) interpretation of "damages," is that the term includes both equitable as well as legal relief. Accordingly the insurers' "legal, technical" definition of damages is rejected, and the summary judgment motions on the Maryland claims will be denied.

In refusing to follow the Fourth Circuit's exposé of Maryland law contained in *Armco,* this Court notes that the relevant section of the *Armco* opinion [20] cites but a single Maryland state court decision. That decision, *Pacific Indemnity Co. v. Interstate Fire & Casualty Co.,* 302 Md. 383, 488 A.2d 486 (1985), is cited for the proposition that "the terms of an insurance policy are to be construed according to the meaning a reasonably prudent layman would infer." *Armco,* 822 F.2d at 1352. This proposition is hardly in keeping with the Fourth Circuit then assigning a "legal, technical meaning" to the term "damages." *See Armco,* 822 F.2d at 1352, 1354.

The Fourth Circuit also makes the following policy argument in support of its *Armco* holding:

> Insurers are very reluctant to cover what are essentially prophylactic measures, such as safety precautions, for the obvious reason that such expenditures are subject to the discretion of the insured, and are not connected with any harm to specific third parties.... [I]nsurers are reluctant to cover avoidance costs [because] insureds are far more likely to overutilize safety measures where another party is paying the bill.

822 F.2d at 1353. Whether or not this argument had any validity in the factual context of *Armco,* it is certainly inapplicable to Chesapeake. No evidence suggests that Chesapeake undertook remedial measures other than out of necessity.[21] This Court cannot fathom that Chesapeake, after depositing waste materials at the Maryland site in or about 1950 (D.I. 152 at 6–7), would then overutilize safety measures some three decades later in a sudden burst of excess caution. In fact Chesapeake asserts that its 1986 clean-up efforts were "for purposes of mitigating or reducing any damage to the groundwater." (D.I. 152 at 8.) If Chesapeake's assertions prove accurate, its clean-up activities may well have served to minimize liability, rather than being overly cautious and wasteful. *Cf. Broadwell Realty Services, Inc. v. Fidelity & Casualty Company of New York,* 218 N.J.Super. 516, 528 A.2d 76, 81–82 (N.J.Super.Ct.App.Div.1987). "It would be folly to argue ... that the insured would be required to delay taking preventative measures, thereby permitting the accumulation of mountainous claims at the expense of the insurance carrier. Stated another way, the policy does not require the parties to calmly await further catastrophe." *Id.* 528 A.2d at 81.

Lastly, while acknowledging a split of authority, this Court notes that a sizeable and growing body of case law has rejected *Armco's* reasoning. *See, e.g., American Motorists Insurance Co. v. Levelor Lorentzen, Inc.,* No. 88–1994, slip op. (D.N.J. Oct. 14, 1988) [available on WESTLAW, 1988 WL 112142] ("[t]he average person would not engage in a complex comparison of legal and equitable remedies in order to define 'as damages,' but would conclude

---

**20.** Part II. is the relevant section of the *Armco* opinion. There the Fourth Circuit held that the costs of complying with regulatory directives and for reimbursement of remedial measures are not "damages." 822 F.2d at 1351–54.

**21.** *See supra* note 5.

based on the plain meaning of the words that the cleanup costs imposed on [the insured] under CERCLA would constitute an obligation to pay damages"); *Intel Corp. v. Hartford Accident and Indemnity Co.,* 692 F.Supp. 1171, 1186–89 (N.D.Cal.1988); *United States Fidelity and Guaranty Co. v. Thomas Solvent Co.,* 683 F.Supp. 1139, 1170 (W.D.Mich.1988) ("find[ing] the *Maryland Casualty [v. Armco]* contractual analysis hypertechnical ... and ultimately unpersuasive"); *New Castle County v. Hartford Accident and Indemnity Co.,* 673 F.Supp. 1359, 1366 (D.Del.1987) (The government "had the power to commence a civil action to enforce corrective measures necessary to protect the environment. Since the required remedial actions were ultimately enforceable in a legal proceeding, they constituted sums that the [insured] was legally obligated to pay as damages."); *Township of Gloucester v. Maryland Casualty Co.,* 668 F.Supp. 394, 398–400 (D.N.J.1987); *Fireman's Fund Insurance Companies v. Ex–Cell–O Corp.,* 662 F.Supp. 71, 75 (E.D.Mich.1987); *Consolidated Rail Corp. v. Certain Underwriters at Lloyds,* No. 84–2609, slip op. at 8–12 (E.D.Pa. June 3, 1986) [1986 WL 6547]; *United States Aviex Co. v. Travelers Insurance Co.,* 125 Mich.App. 579, 336 N.W.2d 838, 843 (Mich.Ct.App.1983) ("[i]t is merely fortuitous from the standpoint of either plaintiff or defendant that the state has chosen to have plaintiff remedy the contamination problem, rather than choosing to incur the costs of clean-up itself and then suing plaintiff to recover those costs"); *Broadwell Realty Services, Inc. v. Fidelity & Casualty Company of New York,* 218 N.J.Super. 516, 528 A.2d 76, 81–82 (N.J. Super.Ct.App.Div.1987). The Court finds the logic employed in *United States Fidelity and Guaranty Co. v. Thomas Solvent Co.,* 683 F.Supp. 1139 (W.D.Mich.1988), to be impeccable:

> [T]he argument concerning the historical separation of damages and equity is not convincing and ... the insured ought to be able to rely on the common sense expectation that property damage within the meaning of the policy includes a claim which results in causing him to pay

sums of money because his acts or omissions affected adversely the rights of third parties.... [F]rom the standpoint of the insured damages are being sought for injury to property. It is that contractual understanding rather than some artificial and highly technical meaning of damages which ought to control.

*Id.* at 1168.

For the foregoing reasons the Court rejects the rationale of *Armco,* and holds that the term "damages" does not, as a matter of law, exclude Chesapeake's costs in cleaning up the Maryland site. The insurers' motions for summary judgment on the Maryland claims will be denied. The Court will now entertain the insurers' motions relating to the Delaware site.

### C. *The Delaware Site*

With respect to the Delaware site, the defendant insurers pose two arguments in support of their summary judgment motions. First, two of the defendant insurers (INA and London Market Insurers) contend that pollution of the Delaware site did not occur in the course of Chesapeake's "operations," as that term is used in the policies, and that any resultant loss therefore falls beyond the scope of insurance coverage. (D.I. 130 at 2.) Additionally, all the moving defendants request the Court to rethink its recent holding in *New Castle County v. Hartford Accident and Indemnity Co.,* 673 F.Supp. 1359 (D.Del.1987), and to conclude that clean-up costs are not "damages" under Delaware law. (D.I. 130 at 2.) The Court will address these two arguments respectively in the following sections of this opinion.

### 1. *Definition Of Operations*

The INA insurance policies and two of the London Market Insurers' policies command defendants to pay "all sums which the insured shall become obligated to pay by reason of liability for damages because of injury to or destruction of property ... *arising out of the operations of the insured as defined herein.*" (D.I. 131A at 58 (emphasis added).) The policies then provide, under the heading DEFINITION OF OPERATIONS, that the policies "shall

cover the manufacture, distribution and sale of *enriched propane gas.*" (D.I. 131A at 60 (emphasis added).)

The defendant insurers note that contamination of the Delaware site arose from the disposal of coal tar, a by-product of the coal gas manufacturing process. (D.I. 131 at 14–15.) Defendants stress the distinction between coal gas and propane gas, asserting that the insurance policies cover only the latter. (D.I. 131 at 15; D.I. 166 at 16.) On this basis defendants seek summary judgment on the Delaware claims.

A moving party is entitled to summary judgment only if there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Such a moving party labors under a very heavy burden, for the court must view all facts, and any inferences reasonably drawn from those facts, in the light most favorable to the non-moving party.[22] *Elmer v. Tenneco Resins, Inc.*, 698 F.Supp. 535, 538 (D.Del.1988); *Wilmington Housing Authority v. Pan Builders, Inc.*, 665 F.Supp. 351, 353 (D.Del.1987) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)).

■■■ In contract actions summary judgment is inappropriate unless the contractual terms present only questions of law; not questions of fact.[23] *Elmer v. Tenneco Resins, Inc.*, 698 F.Supp. at 538; *Alexandria Coca–Cola Bottling Co. v. Coca–Cola Co.*, 637 F.Supp. 1220, 1225

(D.Del.1984). Before it could enter summary judgment in this case, the Court would have to conclude that the contractual language is so clear that it can be read only one way. *Elmer v. Tenneco Resins, Inc.*, 698 F.Supp. at 538; *Alexandria Coca–Cola Bottling Co. v. Coca–Cola Co.*, 637 F.Supp. at 1226 (citing *Landtect Corp. v. State Mutual Life Assurance Co. of America*, 605 F.2d 75, 80 (3d Cir.1979)). If the non-moving party (Chesapeake) presents a *reasonable* reading of the contract which is at odds with the interpretation offered by the movant (defendants), then a question of fact exists which can only be resolved through trial.[24] *Landtect Corp. v. State Mutual Life Assurance Co. of America*, 605 F.2d at 80; *Elmer v. Tenneco Resins, Inc.*, 698 F.Supp. at 538; *Alexandria Coca–Cola Bottling Co. v. Coca–Cola Co.*, 637 F.Supp. at 1226. For the reasons set forth below, the Court holds that Chesapeake has presented such a reasonable reading of the contract. The contract is therefore ambiguous—there is a genuine factual issue as to its meaning, and summary judgment will be denied.

As stated *supra,* the defendants' motion rests on the premise that only activities relating to propane gas production (not coal gas production) are encompassed within the term "operations" as used in the insurance policies. Defendants place great stock in the opening clause of the Definition of Operations, which reads: "This policy shall

---

**22.** The standard for summary judgment mirrors that for a directed verdict. *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir.1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). "As with a Rule 50 directed verdict, a motion for summary judgment may be granted only if, as a matter of law, viewing all the evidence ... in the light most favorable to the party opposing the motion, no jury could decide in that party's favor." *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d at 361. In this action Chesapeake has demanded a trial by jury. (D.I. 80.)

**23.** Analyzing contract disputes potentially entails a two-step process. The Court first determines whether the contractual language is ambiguous. This is a question of law. *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d at 362. A contract is ambiguous if it is susceptible of more than one meaning. *Id.; Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011

(3d Cir.1980). If the Court finds—as a matter of law—that a contract is ambiguous, then the *factfinder* must determine which conflicting interpretation of the contract reflects the parties' intent. *See Landtect Corp. v. State Mutual Life Assurance Co. of America*, 605 F.2d 75, 79 (3d Cir.1979); *Alexandria Coca–Cola Bottling Co. v. Coca–Cola Co.*, 637 F.Supp. 1220, 1225–26 & n. 33 (D.Del.1984). In other words, the existence of an ambiguity raises an issue of fact which must be resolved at trial, thereby precluding summary judgment. *See* 6 J. Moore & J. Wicker, *Moore's Federal Practice* ¶ 56.17[43], at 56–544 (2d ed. 1988).

**24.** The functional equivalent of this proposition is that the defendant insurers' summary judgment motions can succeed only if *both:* (a) the contractual language is unambiguous, *and* (b) the plain meaning of that unambiguous language comports with defendants' interpretation of the contracts.

cover the manufacture, distribution and sale of enriched propane gas...." (D.I. 131A at 60.) Defendants also note that a single clause or passage of an insurance policy cannot be read in isolation. (D.I. 166 at 20 & n. 34 (citing *Cheseroni v. Nationwide Mutual Insurance Co.*, 402 A.2d 1215, 1217 (Del.Super.Ct.1979), *aff'd*, 410 A.2d 1015 (Del.1980)).) Rather, it must be viewed in the context of the whole policy. *Id.* True to the spirit of this mandate, the Court will reproduce the Definition of Operations in its entirety, despite its rather unwieldy length:

> This policy shall cover the manufacture, distribution and sale of enriched propane gas through mains and the distribution, installation and sale of gas appliances *and other goods and all operations of the insured related thereto which shall include, but not be limited to,* the ownership, maintenance and use of mains, plants, properties and elevators; ordinary construction work necessary to the maintenance, extension, repair, addition or *demolition of existing mains, plants and equipment;* extraordinary construction work, *demolition* and construction of new buildings and equipment, either upon the premises of the insured or elsewhere, whether performed by the insured's employees or by others under contract with the insured and the ownership, operation or use of teams.

(D.I. 131A at 60–61 (emphasis added).)

The most striking feature of the foregoing passage, and particularly of the emphasized language, is its expansive breadth. For a variety of reasons (detailed below), a reasonable factfinder could conclude that the above Definition of Operations reaches Chesapeake's disposal of coal tar.

The insurance policies define "operations" to include "the distribution, installation and sale of gas appliances *and other goods....*" (D.I. 131A at 60 (emphasis

added).) It is not inconceivable that coal tar constitutes "other goods." Dictionary definitions of the term "goods" support this view:

> [Goods are] tangible movable personal property having intrinsic value usu[ally] excluding money and other choses in action but sometimes including all personal property ...: chattels, wares, merchandise, food products, *chemical compounds,* and agricultural products....

*Webster's Third New International Dictionary,* at 978 (1971) (emphasis added). *Black's Law Dictionary* defines "goods" as:

> [A] term of variable content and meaning. It may include every species of personal property or it may be given a very restrictive meaning.[25]
>
> Items of merchandise, supplies, raw materials, or finished goods. Sometimes the meaning of "goods" is extended to include all tangible items, as in the phrase "goods and services."

*Black's Law Dictionary,* at 624 (5th ed. 1979) (footnote added). In addition, although not necessary to classify coal tar as "goods,"[26] there is evidence of a once-active market for Chesapeake's coal tar. (*See* D.I. 152 at 6; D.I. 152A at 131, 133–34, 136–37.)

A further ambiguity in the insurance policies is apparent from the following excerpt: "This policy shall cover the manufacture, distribution and sale of enriched propane gas ... *and all operations of the insured related thereto....*" (D.I. 131A at 60 (emphasis added).) Surely a finder of fact could reasonably conclude that coal gas production is "related to" propane gas production in a way that, for example, the operation of a hotel or a fast food franchise would not be related. The end uses and users of coal gas and propane gas appear to be the same. Thus coal tar—a by-product of Chesapeake's coal gas production—

---

**25.** Thus the term "goods" is inherently ambiguous. This fact alone precludes summary judgment on the Delaware claims. *See supra* note 24.

**26.** *Cf. City of Philadelphia v. New Jersey,* 437 U.S. 617, 622, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978) (even the transportation and disposal of *valueless waste* constitutes interstate commerce and is protected by the commerce clause).

is quite possibly "related to" its propane gas operations.

The Definition of Operations covers "all operations of the insured related" to propane gas production, "which shall *include, but not be limited to* [various listed activities]." (D.I. 131A at 60–61 (emphasis added).) The broadening effect of the emphasized language is self-evident, further supporting Chesapeake's reading of the insurance contracts.

The Definition of Operations also includes the *"demolition* of existing mains, plants and equipment; extraordinary construction work, *demolition* and construction of new buildings and equipment...." (D.I. 131A at 61 (emphasis added).) Pollution of the Delaware site allegedly resulted from the burial of coal tar pursuant to the dismantling of Chesapeake's coal gas plant. (D.I. 152 at 6.) Quite conceivably this dismantling falls within the term "demolition," and hence is embraced within "operations" as that term is used in the insurance policies. Moreover, the dismantling of the coal gas plant was part and parcel of a more general plan by Chesapeake to convert to the propane gas technology.[27] (D.I. 131A at 14; D.I. 152 at 5–6; D.I. 152A at 135.)

There is yet another source of ambiguity in the insurance contracts. Article II of the INA policies indicates that they "include coverage ... for liability arising out of the possession, consumption, *handling* or use of *any merchandise or product* manufactured, sold, *handled* or distributed by the insured." (D.I. 131A at 44, 59, 76 (emphasis added).) A finder of fact could rationally conclude that the above-quoted language provides coverage for claims arising out of Chesapeake's handling of coal tar, notwithstanding any restrictive interpretation which might otherwise attach to the Definition of Operations.

Finally, in reading the insurance policies as a whole, the Court notes that these contracts bear the following heading (in very bold print): BLANKET LIABILITY POLICY.[28] (D.I. 131A at 42, 57, 75.) This term obviously has broad connotations. The language supports—although it certainly is not the linchpin of—Chesapeake's reading of the contracts.

To summarize, the Court holds that a reasonable jury could find, at a minimum, that Chesapeake's reading of the contracts reflects the intent of the parties. Accordingly the Court rejects the defendants' argument that "operations" as used in the contracts cannot, as a matter of law, include Chesapeake's disposal of coal tar. Defendants' motion for summary judgment on this ground will therefore be denied. This is not to suggest that the defendants' construction of the contracts is implausible or that it will necessarily be rejected. The determination of which interpretation prevails shall await resolution at trial by the finder of fact.

■ In concluding that the insurance contracts in question contain ambiguous language, the Court is not unmindful of the general rule in Delaware that an insurance contract is construed strongly against the insurer and in favor of the insured. *See Hallowell v. State Farm Mutual Automobile Insurance Company,* 443 A.2d 925, 926 (Del.1982); *Steigler v. Insurance Co. of North America,* 384 A.2d 398, 400 (Del. 1978). The Supreme Court of Delaware has observed, however, that "an insurance contract is construed strongly against the insurer, and in favor of the insured, *because the insurer drafted the language* that is interpreted." *Hallowell v. State Farm,* 443 A.2d at 926 (emphasis added). In the instant case there is some uncertainty as to which party drafted the relevant contractual language, *i.e.* the Definition of Operations. *Compare* D.I. 166 at 17 (defendants' reply brief) ("[t]he special 'definition of operations' at issue here ... was self-evidently 'confected' especially for

---

**27.** It should be noted, however, that the old coal gas plant and the newer propane gas facility are located at different sites within Delaware. (*See* D.I. 152 at 5–6; D.I. 152A at 135.)

**28.** As interpreted by the defendant insurers, the coverage provided by the policies may be more akin to cheesecloth than a blanket.

Chesapeake")[29] *and* D.I. 166 at 13 n. 20 ("there is no evidence that the INA policies before the Court were drafted exclusively by INA") *with* D.I. 152 at 32 (Chesapeake's answering brief) ("INA has produced no evidence to suggest that the policies were drafted by someone other than Indemnity Insurance Company of North America, its predecessor in interest. Indeed, the policies appear to have been prepared on forms prepared by Indemnity Insurance Company of North America."). Thus the question of which party drafted the Definition of Operations is a genuine issue of fact. Disposition of the issue at this time would be premature.

Having found ambiguity in the contracts and rejected defendants' first ground for summary judgment on the Delaware claims, the Court will now turn to defendants' alternative argument.

### 2. *New Castle County v. Hartford Accident And Indemnity Co.*

■ Defendants ask the Court to grant summary judgment on the Delaware claims and to "conclude that, under Delaware law, as under Maryland and Missouri law,[30] clean-up costs are not damages."[31] (D.I. 131 at 4.)

As defendants freely admit, acceptance of their argument would require the Court to reconsider and overturn its recent decision in *New Castle County v. Hartford Accident and Indemnity Co.*, 673 F.Supp. 1359 (D.Del.1987). Just last year this Court concluded that under Delaware law, the term "damages," if not otherwise defined in an insurance contract, includes equitable remedies imposed upon the insured such as clean-up costs. *New Castle County v. Hartford*, 673 F.Supp. at 1365–66.

The Court remains convinced of this fact today. With all due modesty, the Court believes that *New Castle County v. Hartford* was and still is a logical and accurate depiction of Delaware law.

As noted above, the defendants suggest that Delaware law should fall in line with Maryland law on this issue of whether clean-up costs are damages. Aside from the obvious response that Delaware and Maryland are separate sovereigns, each independent of the other, the Court has already rejected the insurers' argument that under Maryland law, clean-up costs are not damages. *See* part III.B. of this opinion, *supra* (rejecting *Armco* as a misstatement of Maryland law).

Accordingly, defendants' argument that Delaware law excludes clean-up costs from the term "damages," is rejected.

### D. *Other Defense*

■ The defendant London Market Insurers offer one additional ground for summary judgment on the Maryland claims. Citing *Mraz v. Canadian Universal Insurance Co., Ltd.*, 804 F.2d 1325 (4th Cir. 1986), the London Market Insurers deny coverage, claiming that environmental response costs relating to the Maryland site are not "property damage."[32] (D.I. 141 at 13.)

The facts of *Mraz* are certainly analogous to the instant case. In *Mraz* an insured corporation had buried certain chemical wastes at a site in Maryland. *Mraz*, 804 F.2d at 1326. The United States and the State of Maryland investigated the site, determined that the buried chemicals were hazardous, and requested the insured to

---

**29.** Of course the fact that a portion of the contract may have been drafted specifically *for* Chesapeake does not necessarily mean that it was drafted *by* Chesapeake.

**30.** Defendants' statement of Missouri law refers to *Continental Insurance Co. v. Northeastern Pharmaceutical & Chemical Co., Inc.*, 842 F.2d 977 (8th Cir.) (a 5 to 3 decision by the *en banc* Eighth Circuit, holding that under Missouri law, the term "damages" as used in comprehensive general liability policies does not include equitable clean-up costs), *cert. denied*, ─── U.S. ───, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988).

**31.** The substance of defendants' argument is identical to that rejected in part III.B. of this opinion, *supra:* namely, that equitable clean-up costs are not "damages." Now, however, the question is raised under Delaware law; not under Maryland law which was applied in part III.B.

**32.** This argument is a slight variation on the position considered (and rejected) in part III.B. of this opinion, *supra,* that equitable clean-up costs are not "damages."

clean up the site. *Id.* Their requests went unsatisfied, so the United States and the State of Maryland cleaned up the site themselves, and then brought suit against the insured to recover the costs of having done so. *Id.*

At this point the insured sought coverage under its liability insurance policies. *Id.* The insurer disclaimed coverage, whereupon the insured brought suit seeking a declaratory judgment that the insurer had a duty to defend and indemnify the insured. *Id.*

The Fourth Circuit in *Mraz* reversed judgment for the insured, holding that no coverage existed because the United States and the State of Maryland had suffered no "property damage." [33] *Id.* at 1329. The Fourth Circuit stated that: "While the complaint does allege that property damage occurred, there are no allegations that [the United States or the State of Maryland] sustained any property damage or that they even have the requisite interest in the [Maryland] site." *Mraz,* 804 F.2d at 1329.

Relying as they do upon *Mraz,* the defendant London Market Insurers would require the State of Maryland—which brought the underlying claim against Chesapeake relating to the Maryland site—to have owned a property interest in the site or in adjacent land in order for coverage to exist. [34]

This Court has expressly rejected both the holding and the reasoning of *Mraz. New Castle County v. Hartford Accident and Indemnity Co.,* 673 F.Supp. 1359, 1366 (D.Del.1987). It will do so again. [35] To trigger coverage under the policies, the

governmental entities which brought the underlying claim against the insured need not themselves have suffered property damage. 673 F.Supp. at 1366. It is sufficient under the policies that the insured was forced to pay damages *because of* property damage. *Id.*

In the instant case, Chesapeake allegedly incurred costs because of contamination of the soil and groundwater at the Maryland site. Soil and groundwater clearly are property. The fact that the State of Maryland may have owned no interest in this property is without legal significance. As in *New Castle County v. Hartford,* the Court rejects the argument (here advanced by the London Market Insurers) that coverage of the Maryland claims hinges upon damage to property owned by the government.

## IV. CONCLUSION

For the reasons set forth in this opinion, the defendant insurers' motions for summary judgment will be denied in their entirety.

---

**33.** By the terms of the insurance policy in *Mraz,* the insurer undertook to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... *property damage.*" 804 F.2d at 1327 (emphasis added).

**34.** Defendants acknowledge that "the relevant terms of the London Market policies mirror the facts of *Mraz.*" (D.I. 141 at 13.) The London Market Insurers policies require the insurers to pay:·
> any and all sums which [Chesapeake] shall by law become liable to pay and shall pay ... as damages
>
> .    .    .    .    .

(b) for damage to or destruction of property of others ... hereinafter referred to as "Property Damage."...
(D.I. 141A at 36, 57.)

**35.** Although *Mraz* was a diversity case on appeal from the District of Maryland, and presumably the court intended to apply Maryland law, the Fourth Circuit cited no Maryland state court decisions in support of its conclusion that the government must itself have suffered property damages. This Court is not bound to follow *Mraz* as a source of Maryland law. *See supra* note 18.